1
2
3
4
5
6
7

C. D. Michel – SBN 144258
Anna M. Barvir – SBN 268728
Tiffany D. Cheuvront – SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445
cmichel@michellawyers.com

Attorneys for Plaintiffs

8
9
10
11

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20
21
22

| NATIONAL RIFLE ASSOCIATION OF AMERICA; DOE,<br><br>                     Plaintiffs,<br><br>        vs.<br><br>CITY OF LOS ANGELES; ERIC GARCETTI, in his official capacity as Mayor of City of Los Angeles; HERB WESSON, in his official capacity as President of the Los Angeles City Council; and HOLLY L. WOLCOTT, in her official capacity as City Clerk of City of Los Angeles,<br><br>                     Defendants. | Case No: 2:19-cv-03212 SVW (GJSx)<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    July 8, 2019<br>Time:    1:30 p.m.<br>Judge:   Honorable Stephen V. Wilson |
|---|---|

23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

Table of Contents ........................................................................................... ii

Table of Authorities ...................................................................................... iii

Introduction .................................................................................................... 1

Factual Background ........................................................................................ 1

I.     National Rifle Association's History, Mission, and Work ..................... 1

II.    The City's Anti-NRA Crusade and the Challenged Ordinance ........... 3

Legal Standard ............................................................................................... 6

Argument ........................................................................................................ 7

I.     Plaintiffs Are Likely to Succeed on the Merits .................................... 7

       A.    The Ordinance Violates the First Amendment Right to Free
             Association ................................................................................. 7

       B.    The Ordinance Violates the First Amendment Right to Free Speech .... 11

             1.    Through the Ordinance, the City Imposes an Ideological
                   Litmus Test for Independent Contractors in Violation of the
                   First Amendment ................................................................ 12

             2.    The Ordinance Impermissibly Compels Disclosure of Political
                   Beliefs and Associations by NRA Members and Supporters in
                   Violation of the First Amendment ...................................... 14

       C.    The Ordinance Violates the First Amendment Because It Retaliates
             Against Plaintiffs for Exercising Their Rights to Free Speech and
             Association. ............................................................................. 17

       D.    The Ordinance Violates the Equal Protection Clause ........................... 18

II.    The Remaining Preliminary Injunction Factors Demand Relief ..................... 20

       A.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief ...... 20

       B.    Preliminary Relief Is in the Public Interest ........................................... 20

       C.    The Balance of the Equities Tips in Favor of Injunctive Relief ........... 20

Conclusion ..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ............................................................. 21

*Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*,
570 U.S. 205 (2013) ............................................................................. 12

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................... 21

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ................................................................. 6

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ................................................................. 17

*Austin v. Mich. Chamber of Commerce*,
494 U.S. 652 (1990), *rev'd on other grounds*, *Citzs. United v. Fed.*
*Elec. Comm'n*, 588 U.S. 310 (2010) ....................................................... 18

*Baird v. State Bar of Arizona*,
401 U.S. 1 (1971) ........................................................................... 12, 14

*Bates v. City of Little Rock*,
361 U.S. 516 (1960) ............................................................................. 14

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*,
518 U.S. 668 (1996) ............................................................................. 17

*Buckley v. Am. Constit. Law Found., Inc.*,
525 U.S. 182 (1999) ............................................................................. 14

*Carey v. Brown*,
447 U.S. 455 (1980) ............................................................................. 11

*Chalk v. U.S. Dist. Ct.* (*Orange Cty. Superin. of Schs.*),
840 F.2d 701 (9th Cir. 1998) ............................................................ 6, 20

*Chamber of Commerce of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ............................................................... 20

*Elrod v. Burns,*
 427 U.S. 347 (1976)........................................................ 12, 20

*Gibson v. Fla. Legis. Investig. Comm.,*
 372 U.S. 539 (1963).............................................. 7, 8, 10, 14

*Jantzen v. Hawkins,*
 188 F.3d 1247 (10th Cir. 1999) ........................................... 13

*Klein v. City of San Clemente,*
 584 F.3d 1196 (9th Cir. 2009) ........................................ 6, 20

*McIntyre v. Ohio Elections Comm'n,*
 514 U.S. 334 (1995)...................................................... 14, 15

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) ............................................... 20

*Monterey Mech Co. v. Wilson,*
 125 F.3d 702 (9th Cir. 1997) ................................................. 6

*NAACP v. State of Alabama ex rel. Patterson,*
 357 U.S. 449 (1958)................................................... *passim*

*Overstreet ex rel. NLRB v. United Bd. of Carpenters & Joiners of Am.,*
 *Local 1506,*
 409 F.3d 1199 (9th Cir. 2005) ............................................... 6

*O'Brien v. Welty,*
 818 F.3d 920 (9th Cir. 2016) ......................................... 17, 18

*O'Hare Truck Serv., Inc. v. City of Northlake,*
 518 U.S. 712 (1996)........................................................... 13

*Perry v. Sindermann,*
 408 U.S. 593 (1972)........................................................... 17

*Police Dep't of City of Chic. v. Mosley,*
 408 U.S. 92 (1972)............................................................ 18

*Preminger v. Principi,*
 422 F.3d 815 (9th Cir. 2005) ............................................... 20

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
 487 U.S. 781 (1988)...................................................... 14, 16

iv

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ........................................................................ 11

*Shelton v. Tucker*,
   364 U.S. 479 (1960) .......................................................................... 9

*Silvester v. Harris*,
   No. 11-cv-2137, 2014 WL 6611592 (E.D. Cal. Nov. 20, 2014) ........................... 21

*Talley v. California*,
   362 U.S. 60 (1960) .......................................................................... 14

*United States v. Mayer*,
   503 F.3d 740 (9th Cir. 2007) ........................................................... 8, 10

*Verlo v. Martinez*,
   820 F.3d 1113 (10th Cir. 2016) ............................................................ 6

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ........................................................................ 12

*Williams v. Rhodes*,
   393 U.S. 23 (1968) .......................................................................... 18

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ........................................................................ 14

**Other Authorities**

Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1202
   (4th ed. 2011) ............................................................................... 7

U.S. Const., amend. I ............................................................ *passim*

U.S. Const., amend. II ......................................................... 1, 3

U.S. Const., amend. XIV ...................................................... 1, 20

TABLE OF AUTHORITIES

## INTRODUCTION

It is no secret that the city of Los Angeles does not subscribe to the same core beliefs that the National Rifle Association and its members hold dear. NRA and its supporters, through the exercise of their First Amendment rights of speech and association, seek to bring about political and social change and to educate people on the safe handling of firearms. The City, on the other hand, often passes ordinances and expresses support for local, state, and federal laws making it increasingly difficult for law-abiding citizens to own a firearm without falling prey to the many legal traps that have been set for the unwary gun owner.

But for the City, this is not enough.

In February, the City passed Ordinance No. 186000, requiring city contractors to disclose any contract with or sponsorship of NRA. The new law seeks to chill the speech of NRA members and sponsors, making them choose whether to continue supporting NRA and risk the ire of a city that seeks to "rid itself" of such businesses, or succumb to the City's political pressure and break its formal ties with the Second Amendment civil rights organization. The Ordinance is extreme, a first-of-its-kind law that threatens contractors that oppose the City's anti-NRA agenda with loss of lucrative government contracts from a city "with an annual budget approaching $9 billion." Decl. Anna M. Barvir Supp. Mot. Prelim. Inj. ("Barvir Decl."), Ex. 33.

Without preliminary relief, the speech of Plaintiff NRA and its members, including Plaintiff John Doe, be chilled and if not entirely stopped, depriving Plaintiffs of their rights under the First and Fourteenth Amendments. Plaintiffs thus ask this Court to enjoin preliminarily the Ordinance until this Court can resolve the important constitutional questions the Ordinance raises.

## FACTUAL BACKGROUND

### I.   NATIONAL RIFLE ASSOCIATION'S HISTORY, MISSION, AND WORK

NRA is a membership organization with a rich history of promoting firearm safety, preserving the shooting sports, and advocating for the rights its members and

1

all Americans. Barvir Decl., Ex. 11. The organization provides firearm safety training, recreational and competitive shooting matches, programs for women and youth, and school safety programs. *Id.*, Ex. 12. To keep these programs viable, as well as to continue its mission to protect the individual right to keep and bear arms, NRA relies on member dues, sponsorships, and other contributions from businesses and individuals. *Id.*, Ex. 13. It also relies on dues and donations to compete with well-funded groups that advocate opposing messages.

NRA has a stable of sponsors that range from large corporations offering discounts to members to smaller, local retailers who donate their employees' time to build the membership base of NRA and share information about programs, safety, and political issues. Req. Jud. Notice Supp. Mot. Prelim. Inj. ("Req. Jud. Notice"), Ex. 3 at 1. Many of these members and sponsors also contract or could contract with the City to provide essential goods and services, like firearms, ammunition, and tactical equipment, as well the use of firing ranges for training of law enforcement. *See, e.g.*, Barvir Decl., Ex. 31 at 1 (listing a provider of .177 caliber air guns that sponsors youth air gun events for NRA that disclosed its ties to NRA as part of its bid for a city contract).

NRA also has millions of members residing throughout the United States. Req. Jud. Notice, Ex. 3 (accepting claims that NRA has 5 million members); Barvir Decl., Ex. 11 (claiming that NRA has 5 million members), Ex. 14 at 2, 12 (2017 Pew Research Center finding that 30% of Americans report owning a firearm and 19% of gun owners say they belong to NRA). People join the organization for many reasons. Many do enjoy the benefits from corporate sponsors that membership in such a large and prestigious organization provides. Barvir Decl., Ex. 15. But most, if not all, support NRA every year because of the power that comes from a common voice working to protect their constitutional rights. *Id.*, Ex. 16. This voice speaks out against government over-reach and policies that would seek to infringe on lawful firearm possession.

Plaintiff John Doe operates a lawful business in California and, over the years, has maintained contracts with the city of Los Angeles. Decl. Tiffany D. Cheuvront Supp. Mot. Prelim. Inj. ("Cheuvront Decl."), ¶¶ 3-4.  Doe wishes to continue bidding for and obtaining such contracts in the future. *Id.*, ¶ 5. Doe is a member and supporter of NRA and its mission to protect against infringement of Second Amendment rights. *Id.*, ¶ 6. The NRA brings this claim on Doe's behalf and on behalf of all other NRA members who contract with or wish to contract with the City.

## II.   THE CITY'S ANTI-NRA CRUSADE AND THE CHALLENGED ORDINANCE

The state of California has one of the most rigorous regulatory schemes for gun policy and the commerce of firearms of any state in the nation. Many California cities still compete to be "leaders" in gun control, passing ever-expanding restrictions on the lawful acquisition, ownership, and possession of firearms and ammunition, regardless of the laws' impact on public safety and welfare. Barvir Decl., Ex. 29 at 4. Los Angeles is a leader among these cities. Indeed, it is often the target of gun control groups whose goal is to limit the rights of gun owners. And City officials oblige, championing a broad gun-control agenda. For instance, the City has passed laws prohibiting the possession of so-called "large capacity magazines" and mandating locked storage of firearms in the home. *Id.*, Exs. 1-2.

Many NRA members and supporters disagree with the sweeping gun-control policies the City seeks to implement. NRA thus stands in the gap for its members who see no other group with comparable ability to promote their pro-Second Amendment beliefs, including belief in the right to self-defense. And it often stands against the City's relentless attempts to chip away at its members' rights.

Intending to silence NRA's voice, as well as the voices of all those who dare oppose the City's broad gun-control agenda, the City adopted Ordinance No. 186000, requiring current and prospective City contractors to disclose any "sponsorship" of or "contract" with NRA. Req. Jud. Notice, Ex. 3 at 3. Some City councilmembers have claimed that the Ordinance is not meant to deny anyone a contract with the City, but

3

to expose those that support NRA because residents "deserve to know."[1] Even if that were a legitimate goal, it is not the Ordinance's true intent. As one councilmember put it, the City "should have the ability to make decisions about whether we want to do business with companies that feel that they can profit from what the NRA is doing throughout our country." Krekorian Remarks, *supra*, at 1:37:33.

City councilmembers have made disparaging, false, and hyperbolic statements about NRA and its supporters, suggesting that the organization engages in unlawful conduct. Indeed, Councilmember Mitchell O'Farrell, the Ordinance's sponsor, has repeatedly called on the City to "rid itself" of those associated with NRA and labelled the NRA an "extremist" and "white supreme [sic] peddling" group. Req. Jud. Notice, Ex. 4 ; O'Farrell Remarks, *supra*, at 1:33:39—1:35:24. And the City itself has a shameful history of pressuring business that seek to do business in the City to end relationships with NRA.

For example, in 2018, the City held up a contract with FedEx to operate a warehouse and office space in the City based solely on FedEx's affinity discount program for NRA members. Barvir Decl., Ex. 17. When FedEx announced that it had ended the program, O'Farrell took a victory lap, announcing that he had "told @FedEx executives earlier this year, 'there is no high road in doing business with the @NRA." He thanked FedEx for "realizing their role in promoting violence & terror on American soil." *Id.*, Ex. 25 at 4 (O'Farrell's October 31, 2018 tweet).

Around the same time, O'Farrell introduced a motion before the Budget & Finance Committee, expressing the urgent need to act against NRA and its supporters. Req. Jud. Notice, Ex. 4, Barvir Decl., Ex. 33. The motion called on city staff to draft a report listing all organizations with formal ties to NRA and "options

---

[1] Req. Jud. Notice, Ex. 6; Barvir Decl., Ex. 27; *see also* Councilmember Mitchell O'Farrell, Remarks at Meeting of Los Angeles City Council ("O'Farrell Remarks") at 1:34:22 (Feb. 12, 2019), *available at* http://lacity.granicus.com/MediaPlayer.php?view_id=129&clip_id=18753; Councilmember Paul Krekorian, Remarks at Meeting of Los Angeles City Council ("Krekorian Remarks") at 1:37:30 (Feb. 12, 2019), *available at* http://lacity.granicus.com/MediaPlayer.php?view_id=129&clip_id=18753.

1   for the City to immediately boycott those businesses and organizations until their
2   formal relationship with the NRA ceases to exist." Req. Jud. Notice, Ex. 4. The
3   committee approved the motion to "rid itself of its relationships with any
4   organization that supports the NRA." *Id.*, Exs. 4-5. The City Council ultimately
5   abandoned the March 2018 resolution.

6       But, last fall, O'Farrell brought another motion to the Budget & Finance
7   committee, seeking to force companies doing business with the City to disclose any
8   formal relationships with NRA. *Id.*, Ex. 6. The September motion called upon the
9   City Attorney to draft ordinance requiring contractors to disclose "(1) any contracts it
10  or any of its subsidiaries has with the National Rifle Association; and (2) any
11  sponsorship it or any of its subsidiaries provides to the National Rifle Association."
12  *Id.* The motion spoke of the perceived advantage the NRA has in promoting its
13  beliefs because of the financial support of members and donors. *Id.* But it raised no
14  public safety issues or concerns about the ability of NRA-affiliated contractors to
15  perform. *Id.* The motion passed committee, *id.*, Ex. 5, before moving to the full City
16  Council, which unanimously voted to adopt the motion, *id.*, Ex. 7.

17      In January, the City Attorney presented the draft ordinance, requiring all
18  prospective City contractors to disclose in an affidavit any "sponsorship" of or
19  contract with NRA. *Id.*, Ex. 8. As drafted, the ordinance defines "sponsorship"
20  narrowly as any "agreement between a Person and the NRA to provide a discount to
21  the NRA or an NRA member of the customary costs, fees or service charges for
22  goods or services." *Id.*, Ex. 3 at 3. But requiring contractors to disclose all types of
23  "contracts" with NRA brings within the law's scope virtually any support for the
24  organization whatsoever, *including paid memberships in the organization. Id.*

25      The City unanimously passed the proposal with little discussion. *Id.*, Ex. 9.
26  Though O'Farrell, the Ordinance's sponsor, took the time to declare his hatred for
27  NRA and its efforts to oppose the City's gun-control agenda. During the council
28  meeting, for instance, he called NRA an "extremist, white supreme-peddling" group

5

1  that "peddle[s] in . . . violence and extremism." O'Farrell Remarks, *supra*, at

2  1:32:39—1:34:38. Mayor Eric Garcetti signed the Ordinance on February 18th. Req.

3  Jud. Notice, Ex. 9. The law took effect on April 1, 2019. *Id.*, Ex. 3 at 7; *see also*

4  Barvir Decl., Ex. 31 (compilation of submitted affidavits of NRA affiliation). And

5  Plaintiffs promptly sued, seeking declaratory and injunctive relief and damages.

6  Compl., ECF No. 1. They now seek a preliminary injunction to halt the enforcement

7  of the law while this case proceeds on the merits.

8  **LEGAL STANDARD**

9  "The purpose of a preliminary injunction is to preserve the status quo pending

10  a determination of the action on the merits." *Chalk v. U.S. Dist. Ct.* (*Orange Cty.*

11  *Superin. of Schs.*), 840 F.2d 701, 704 (9th Cir. 1998). To obtain preliminary

12  injunctive relief, the moving party must show: (1) a likelihood of success on the

13  merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the

14  balance of equities tips in favor of injunction; and (4) that an injunction is in the

15  public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046,

16  1052 (9th Cir. 2009). In practice, however, likelihood of success is often the

17  determinative factor when First Amendment rights are at stake. *Cf. Monterey Mech*

18  *Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (holding that irreparable harm is

19  presumed when First Amendment rights are violated); *Klein v. City of San Clemente*,

20  584 F.3d 1196, 1208 (9th Cir. 2009) (holding that when a challenged law violates

21  free speech, "[t]he balance of equities and the public interest . . . tip sharply in favor

22  of" injunction); *see also Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016)

23  ("In the First Amendment context, the likelihood of success on the merits will often

24  be the determinative factor because of the seminal importance of the interests at

25  stake."). On the other hand, if there are "serious questions going to the merits" and

26  the balance of harms tips sharply in favor of injunction, the movant need only show

27  "a fair chance of success on the merits." *Overstreet ex rel. NLRB v. United Bd. of*

28  *Carpenters & Joiners of Am., Local 1506*, 409 F.3d 1199, 1207 (9th Cir. 2005).

# ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are exceedingly likely to succeed on the merits of their claims that the Ordinance violates the rights to free association, free speech, and equal protection. The City simply cannot condition the award of its government contracts on the forfeiture of these rights. The Ordinance violates this fundamental principal in several respects. First, it infringes on the rights of NRA members and supporters to associate freely without government retribution. Second, it imposes an ideological litmus test designed to penalize City contractors because of their protected political beliefs and associations. Third, it compels City contractors' speech, requiring that they disclose any formal support for NRA, with no legitimate justification. Fourth, it seeks to retaliate against public contractors for engaging in protected speech and association. And finally, it violates the Equal Protection Clause by burdening disfavored speakers in the exercise of their First Amendment rights. While Plaintiffs are likely to prevail on each of these claims, they need only prevail on one for preliminary relief to issue.

### A.   The Ordinance Violates the First Amendment Right to Free Association

The First Amendment protects the right to associate freely with others to advance one's beliefs. *NAACP v. State of Alabama ex rel. Patterson* (*NAACP*), 357 U.S. 449, 460 (1958). This necessarily "encompasses protection of privacy of association in organizations." *Gibson v. Fla. Legis. Investig. Comm.*, 372 U.S. 539, 544 (1963). For "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP*, 357 U.S. at 462. Thus, laws mandating disclosure of group associations "which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 460-61, *see also* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1202 (4th ed. 2011) ("[T]he government may require disclosure of membership, where disclosure will

7

chill association, only if it meets strict scrutiny."). The Ninth Circuit has held that this requires the government to prove (1) it has a compelling interest in imposing a "hardship on associational rights"; and (2) that the disclosure has a "substantial connection" to that interest. *United States v. Mayer*, 503 F.3d 740, 748 (9th Cir. 2007) (citing *NAACP*, 357 U.S. at 462; *Gibson*, 372 U.S. at 557). Here, the City cannot meet its burden to justify the Challenged Ordinance's compelled disclosure requirement at either step. Plaintiffs are likely to succeed on the merits of their claim that the Ordinance violates the First Amendment right to free association.

In *NAACP v. State of Alabama ex rel. Patterson*, the Supreme Court held that the government could not compel the NAACP to disclose its list of members. 357 U.S. at 466. The Court held that "[c]ompelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order as [as requiring members of particular religions to wear identifying arm-bands]." *Id.* at 462. And it stressed the vital importance, in many cases, of protecting the privacy of group association to preserve the freedom of association. *Id.* In the NAACP's case, the Court recognized that disclosure of the organization's member list would expose its members "to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462. Under these circumstances, the Court held, the compelled disclosure amounted to a "substantial restraint" on the right to freedom of association. *Id.* For it would likely adversely affect

> the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, *in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs* . . ..

*Id.* at 462-63 (emphasis added). For that reason, the Court held that the disclosure requirement must be justified by a compelling government interest. *Id.* at 463. Assuming the state's interests were compelling, the Court held that the requirement was not justified because the state had not shown that the disclosure had a "substantial bearing" on either of the state's asserted interests. *Id.* at 464-65.

8

MEMORANDUM OF POINTS & AUTHORITIES

1    Similarly, in *Shelton v. Tucker*, 364 U.S. 479, 490 (1960), the Supreme Court

2    invalidated a law requiring teachers to disclose all their group associations. The Court

3    recognized that, even if the disclosure were not made public, such a mandate would

4    impose a "constant and heavy" pressure on "teacher[s] to avoid any ties which might

5    displease those who control [their] professional destin[ies]." *Id.* at 486. Even though

6    the Court recognized that the state had a compelling interest in weighing the fitness

7    of its public-school teachers, the Court held that "the state cannot pursue the goal by

8    means that broadly stifle fundamental personal liberties when the end can be more

9    narrowly achieved." *Id.* at 488. And demanding the disclosure of associational ties

10   that do not affect a teacher's competence or fitness "goes far beyond what might be

11   justified in the exercise of the State's legitimate inquiry." *Id.* at 490.

12   Here, compelling NRA members and sponsors to disclose their relationship

13   with NRA will no doubt "expose[] these members to economic reprisal, loss of

14   employment, threat of physical coercion, and other manifestations of public

15   hostility." *NAACP*, 357 U.S. at 462. Indeed, that was the City's goal. City

16   councilmembers made little attempt to hide their desire to retaliate against NRA's

17   supporters, requiring them to disclose their relationship with the organization so that

18   the City could, in turn, deny (or cancel) city contracts.[2] So, like the forced disclosure

19   in *Shelton*, the Ordinance imposes a "constant and heavy" pressure on potential

20   contractors "to avoid any ties [with NRA] which might displease those who control

21   [their] professional destin[ies]." 364 U.S. at 486.

22   But even if the City did not intend to cut economic ties with these contractors,

23   the forced disclosure would necessarily expose NRA supporters to all manner of

24   "other manifestations of public hostility," as evidenced by the countless "hit piece"

25   articles, social media posts, and attempted boycotts against any company "outed" as

26   an NRA supporter. *See, e.g.*, Barvir Decl., Exs. 17-26. Just like the disclosure

27

28   _____
     [2] Req. Jud. Notice, Ex. 4, Ex. 6; Barvir Decl., Ex. 25 at 2-4, 9, 33; O'Farrell
     Remarks, *supra*, at 1:34:22; Krekorian Remarks, *supra*, at 1:37:30.

9

requirement in *NAACP*, the clear result (if not the very purpose) of the challenged ordinance is to "induce members to withdraw from the [NRA] and dissuade others from joining it because of fear of exposure of their beliefs." 357 U.S. at 464. And, just like *NAACP*, under these circumstances, the disclosure requirement amounts to a "substantial restraint" on the right to freedom of association. *Id.* at 462.

The Ordinance declares that this restraint on First Amendment rights is necessary because Los Angelenos "deserve to know if the City's public funds are spent on contractors that have contractual or sponsorship ties with the NRA" and because "[p]ublic funds provided to such contractors undermines the City's efforts to legislate and promote gun safety." Req. Jud. Notice, Ex. 3 at 2. Essentially, the City seeks to justify its infringement on Plaintiffs' associational rights because NRA engages in pro-gun speech, including successful political lobbying, with which the City disagrees. Through the Ordinance, the City hopes to pressure NRA supporters and members to end their relationships with NRA, reducing NRA's funding and support and, ultimately, its pro-Second Amendment speech. *Id.*, Ex. 3 at 1-2 This is hardly the sort of interest that can justify curtailing the fundamental rights of untold numbers of NRA members and supporters. For a vital purpose of the right of free association is to protect *dissidents* from government attempts to silence their voices. *See NAACP*, 357 U.S. at 462. Protecting the *government* from dissidents' attempts to have their voices heard grossly inverts the interests at stake and simply is not a legitimate justification to withhold the right.

But even if the City could point to some broader interest in public safety, it cannot prove, as it must, that the compelled disclosure here has a "substantial connection" to that interest. *See Mayer*, 503 F.3d at 748 (citing *Gibson*, 372 U.S. at 557). Indeed, no evidence could show that financial contributions made by contractors affiliated with NRA have, to any degree, undermined the City's efforts to "legislate and promote gun safety." These dollars are so far outside the chain of causation of gun violence in the City (or anywhere, for that matter), that there is no

1   way the law serves any legitimate interest other than at the broadest, most abstract

2   level. It is pure speculation that a single cent paid to a contractor from the City's

3   coffers would ever make its way to NRA. But even if it did, the City could never

4   trace those funds to any effort to "undermine" a particular attempt to promote gun

5   safety in Los Angeles. And even if NRA could persuade the City to reject a gun

6   control law (which is implausible), there is no way to link any act of violence to the

7   lack of such a law. Simply put, any dollars given to NRA by contractors who do

8   business with the City is so attenuated from any NRA efforts to oppose Los Angeles'

9   gun-control agenda, that the law cannot possibly serve that vague interest.

10      For these reasons, the Ordinance violates Plaintiffs' associational rights and

11  should be enjoined.

12      **B.      The Ordinance Violates the First Amendment Right to Free Speech**

13      The First Amendment provides that "Congress shall make no law . . .abridging

14  the freedom of speech, or of the press, or the right of the people to peaceably

15  assemble and to petition the government for a redress of grievances." U.S. Const.

16  amend. I. The Supreme Court has recognized that speaking out about public issues,

17  like NRA and its members often do, "has always rested on the highest rung of the

18  hierarchy of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467 (1980).

19  Indeed, "[i]t is axiomatic that the government may not regulate speech based on its

20  substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of*

21  *Univ. of Va.*, 515 U.S. 819, 828 (1995).

22      There's simply no justification for the Ordinance that escapes the might of

23  these rules. The City may not condition the benefits at issue on a demonstration of

24  ideological purity. Such a litmus test fundamentally abridges core First Amendment

25  activity. And the City may not compel a response to its litmus test under the

26  circumstances present here. It serves no compelling interest and is far too blunt.

27  / / /

28

1

2

       **1.**      **Through the Ordinance, the City Imposes an Ideological Litmus Test for Independent Contractors in Violation of the First Amendment**

3          The Ordinance violates the fundamental right to be free from government

4  inquisition into one's protected beliefs and associations. As the Supreme Court

5  recognized in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642

6  (1943), "no official, high or petty, can prescribe what shall be orthodox in politics,

7  nationalism, religion, or other matters of opinion or force citizens to confess by word

8  or act their faith therein." Since *Barnette*, the Supreme Court has consistently held

9  that the right to hold one's personal "beliefs and to associate with others of [like-

10  minded] political persuasion" lies at the heart of the First Amendment. *Elrod v.

11  Burns*, 427 U.S. 347, 356 (1976). To protect these rights, the First Amendment

12  prohibits the government from imposing an ideological litmus test as a condition of

13  receiving government benefits.

14          The Supreme Court's decision in *Baird v. State Bar of Arizona*, 401 U.S. 1

15  (1971), is instructive. There, the Court held that the First Amendment prohibited the

16  state bar from requiring an applicant "to state whether she had ever been a member of

17  the Communist Party or any organization 'that advocates overthrow of the United

18  States Government by force or violence.' " *Id.* at 4-5. A plurality of the Court held

19  that "when a State attempts to make inquiries about a person's beliefs or associations,

20  its power is limited by the First Amendment." *Id.* at 6. Indeed, when the government

21  demands the disclosure of this protected information, "a heavy burden lies upon it to

22  show that the inquiry is necessary to protect a legitimate state interest." *Id.* at 6-7. But

23  "whatever justification may be offered, [the government] may not inquire about a

24  man's views or associations solely for the purpose of withholding a right or benefit

25  because of what he believes." *Id.* at 7 (emphasis added).

26          The same principle applies to conditions on government contracts. *See, e.g.*,

27  *Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 570 U.S. 205, 218-219

28  (2013) (holding that the government cannot require organizations to adopt a policy

opposing prostitution as a condition of receiving government funds). Indeed, any attempt to penalize a government contractor for its beliefs or associations violates the First Amendment, unless the goods or services provided "require[] political allegiance." *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999) (applying this test to employees); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996) (applying same test to government contractors).

Here, as the Ordinance's legislative history shows, the disclosure requirement does little more than target for punishment those with disfavored political beliefs and associations. Last March, when the City first conceived of identifying and boycotting NRA-affiliated businesses, proponents of the measure claimed the City must "rid itself" of those that support NRA and its opposition to gun control. Req. Jud. Notice, Ex. 4. Later, the Budget and Finance Committee called NRA a "propaganda machine" and "one of the most significant roadblocks" to the City's gun-control agenda. *Id.*, Ex. 6. It also claimed that the City "*deserves*" to know who is supporting NRA. *Id.* Later, in testimony before the full City Council, O'Farrell called NRA an "extremist" and "white supreme" group that "peddles in gun violence." O'Farrell Remarks, *supra*, at 1:32:39—1:34:38. And Councilmember Paul Krekorian outwardly admitted to the thinly veiled purpose of the Ordinance—to allow the City "to make a determination of whether we want to do business with" anyone who has a relationship with NRA based on the existence of that relationship. Krekorian Remarks, *supra*, at 1:37:33.

On the other hand, not one councilmember claimed that the Ordinance would serve any compelling government interest. They did not suggest that the City needs the information to determine whether someone would be a suitable and responsible contracting partner. Nor could they have, for there is no plausible justification for the disclosure requirement, except a bare desire to ferret out those who harbor disfavored political beliefs and associations (with NRA) and to punish them by denying them City contracts. That "justification" simply cannot survive First Amendment scrutiny.

13

1  *See Baird*, 401 U.S. at 7.

2  ### 2.   The Ordinance Impermissibly Compels Disclosure of Political
3          Beliefs and Associations by NRA Members and Supporters in
         Violation of the First Amendment

4  The First Amendment has long been understood to protect not only the right *to*
5  speak, but also the right *not* to. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487
6  U.S. 781, 796–97 (1988). For both rights are "complementary components of the
7  broader concept of individual freedom of mind." *Wooley v. Maynard*, 430 U.S. 705,
8  714 (1977). The Supreme Court has thus held that government coercion of speech is
9  presumptively unconstitutional when it burdens speech by compelling speakers to
10 disclose what they would be reluctant to disclose, including their identities, deterring
11 them from engaging in speech. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514
12 U.S. 334, 341-42 (1995); *Buckley v. Am. Constit. Law Found., Inc.*, 525 U.S. 182,
13 201-05 (1999); *Talley v. California*, 362 U.S. 60, 65-66 (1960).

14 Indeed, the Court has long held "that significant encroachments on First
15 Amendment rights of the sort that compelled disclosure imposes cannot be justified
16 by a mere showing of some legitimate governmental interest." *Buckley*, 424 U.S. at
17 64. No, such laws must survive "exacting scrutiny." *Id.* (citing *NAACP*, 357 U.S. at
18 463). There must be " 'relevant correlation' or 'substantial relation' between the
19 government interest and information required to be disclosed." *Id.* (citing *Bates v.
20 City of Little Rock*, 361 U.S. 516, 525 (1960); *Gibson*, 372 U.S. at 546). The same
21 applies even when the First Amendment rights are deterred "not through direct
22 government action, but indirectly as an unintended but inevitable result of the
23 government's conduct in requiring disclosure." *Id.* at 65 (citing *NAACP*, 357 U.S. at
24 461). Again, because the City can prove no "substantial relation" between any
25 legitimate interest and the information sought, the Ordinance unconstitutionally
26 compels speech by NRA members and supporters.

27 In *McIntyre v. Ohio Election Commission*, the Supreme Court held that a
28 speaker's "decision to remain anonymous, like other decisions concerning omissions

14

MEMORANDUM OF POINTS & AUTHORITIES

1  or additions to the content of a publication," is protected by the First Amendment.

2  514 U.S. at 341-42. Recognizing that government compulsion of a speaker's identity

3  can be a significant deterrent to engaging in speech because of the risk of "economic

4  or official retaliation" or "social ostracism," the Court had little trouble striking a

5  state law requiring speakers to identify themselves when arguing for or against a

6  ballot measure. *Id.* at 341-42, 357.

7         Here, the Ordinance requires that anyone that contracts or seeks to contract

8  with the City "fully disclose, prior to entering into a Contract, all of its and its

9  Subsidiaries' contracts with or sponsorship of the NRA." Req. Jud. Notice, Ex. 3 at

10  3. NRA, and its supporters, are often the target of backlash for their views. For

11  instance, after the mass murder at Marjory Stoneman Douglas High School, anti-gun

12  activists launched a campaign targeting NRA's supporters. Barvir Decl., Exs. 17-24,

13  32. "ThinkProgress posted a list of companies that supported the NRA . . . [by

14  providing] special offers [for members]," and "[s]upporters of gun control . . . signed

15  petitions calling for them to end their ties with the group. Activists have even created

16  a Google Doc of the companies involved with NRA, urging people to boycott their

17  products." *Id.*, Ex. 24. In this day and age, it is beyond dispute that disclosure of

18  one's affiliation with NRA and opposition to gun control might lead one to social

19  ostracism, job loss, unlawful government retaliation, or even violence.

20         What's more, the Ordinance's particular brand of compelled speech does not

21  merely have the unintended consequence of chilling contractors' support of and

22  affiliation with NRA—that was the Ordinance's intent. Indeed, the Ordinance is

23  *meant* to stigmatize those that would seek to support the political speech of NRA in

24  order to eliminate NRA's voice from public life. Certainly, the fear of losing a

25  contract with the City for either having connections to NRA or for failing to disclose

26  them may cause one to stop supporting NRA altogether. The chilling of this speech

27  would ultimately cause NRA to lose necessary funding and possibly members. The

28  loss of funding, sponsors, and members affects the amount of political speech NRA

1  can make on its members' behalf—a fact not lost on the City:

2         WHEREAS, the benefits and discounts the NRA arranges for its

3  membership entices new members to join and existing members to
   renew their NRA membership. The millions of dollars generated from
4  the new and renewed membership dues fund the NRA agenda of
   opposing legislative efforts throughout the country to adopt sensible
5  gun regulations. The membership dues also finance the NRA's
   nationwide effort to repeal existing gun control measures and to
6  diminish local and state government's ability to adopt sensible gun
   legislation.

7  Req. Jud. Notice, Ex. 3 at 1.

8         At first glance, the Ordinance might appear narrowly drawn, targeting only a

9  specific type of NRA "sponsor." But the requirement that potential contractors

10 disclose any type of "contract" with NRA, Req. Jud. Notice, Ex. 3 at 3, broadens the

11 reach of the law to any agreement a potential contractor might have with NRA. The

12 types of relationships the City demands disclosure of are thus too many to list—but

13 they include

14        1.     The provision of affinity discounts to NRA members;

15        2.     Agreements between local businesses and NRA to advertise and process

16               membership applications;

17        3.     Financial donations to support the work of NRA Institute for Legislative

18               Action, the organization's "lobbying arm," Barvir Decl., Ex.28;

19        4.     Agreements between shooting ranges and NRA to host educational

20               seminars, safety trainings, or competitions; and

21        5.     Individual paid memberships with the organization.

22        And because the City fails to define which NRA "contracts" must be disclosed,

23 there's no telling what sorts of agreements individual contractors may fear require

24 disclosure under the law—resulting in widespread self-censorship to prevent

25 potential retribution from the City. *See Riley*, 487 U.S. at 794 ("[T]he 'chill and

26 uncertainty' of disclosure requirements . . . might well 'encourage them to cease

27 engaging in certain types' of First Amendment Activity.") Far from being narrowly

28 tailored, the Ordinance regulates in the broadest terms. And, again, the City has no

1    legitimate interest in such a pervasive compulsion of speech. *See supra* pp. 13-14.

2           Because the Ordinance imposes an ideological litmus test on contractors and

3    unjustifiably compels their speech about political beliefs and associations, the

4    Ordinance violates the fundamental right to free speech. Plaintiffs are thus likely to

5    succeed on the merits of this claim and preliminary relief is appropriate.

6           **C.    The Ordinance Violates the First Amendment Because It Retaliates
            Against Plaintiffs for Exercising Their Rights to Free Speech and
7           Association**

8           The government " 'may not deny a benefit to a person on a basis that infringes

9    his constitutionally protected . . . freedom of speech' even if he has no entitlement to

10   that benefit." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668,

11   674 (1996) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). To state a

12   claim for First Amendment retaliation, "the plaintiff must allege that (1) it engaged in

13   constitutionally protected activity; (2) the defendant's actions would 'chill a person

14   of ordinary firmness' from continuing to engage in the protected activity; and (3) the

15   protected activity was a substantial motivating factor in the defendant's conduct—

16   i.e., that there was a nexus between the defendant's actions and an intent to chill

17   speech." *Ariz.  Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir.

18   2016) (quoting *O'Brien v. Welty*, 818 F.3d 920, 933-34 (9th Cir. 2016)).

19          One of NRA's important activities is to influence politics to the benefit of its

20   members. The organization stands in the gap for its members who consistently find

21   anti-gun advocacy groups placing pressure on those making political decisions for the

22   communities in which they live and work. Every day, NRA represents the views of

23   its members in the activities that it undertakes. And it relies on its members and

24   supporters to do this work effectively. Threatening the livelihood of NRA's

25   supporters by denying them government contracts as retribution for their

26   associational ties to NRA is to threaten the livelihood of NRA as retaliation for

27   engaging in political speech and expression with which the City disagrees. It is a

28   textbook violation of the First Amendment.

Indeed, requiring the disclosure of any sponsorship of or contract with NRA as a precondition for being awarded a City contract can be expected to "chill a person of ordinary firmness" from continuing to associate with NRA through sponsorships or contracts, including paid membership in the organization. *O'Brien*, 818 F.3d at 933-34. On its face, the Ordinance makes clear that its intention is to harm NRA by diminishing access to funding from members, sponsors, and supporters that fuels NRA's political agenda. Req. Jud. Notice, Ex. 3 at 1-3. The legislative history of the Ordinance proves that the City intends to boycott NRA-affiliated businesses. *Id.*, Ex. 4. Ex. 6. And the City, through motions, social media, and on-the-record comments, have disparaged NRA and its supporters and have expressed their disdain for the organization simply because it disagrees with the organization's pro-Second Amendment viewpoint. *Id.*, Ex. 3 at 1-2, Ex. 4, Ex. 6; Barvir Decl., Exs. 25-26; Krekorian Remarks, *supra*, at 1:36:22—1:38:42; O'Farrell Remarks, *supra*, at 1:33:39—1:35:24. There is thus a clear nexus between the Ordinance and the City's intent to chill Plaintiffs' speech.

For these reasons, Plaintiffs are likely to succeed on their First Amendment retaliation claim.

### D.     The Ordinance Violates the Equal Protection Clause

The Ordinance also violates the Equal Protection Clause by penalizing a class of potential contractors based on their protected beliefs, expression, and association without sufficient justification. "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of City of Chic. v. Mosley*, 408 U.S. 92, 101 (1972) (citing *Williams v. Rhodes*, 393 U.S. 23, 89 (1968)). Indeed, "[b]ecause the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *rev'd on other grounds*, *Citzs. United v. Fed. Elec. Comm'n*, 588

18

1  U.S. 310, 340 (2010). Because the Ordinance at issue discriminates against NRA-
2  affiliated contractors, forcing them alone to disclose their political associations and
3  because it is not narrowly tailored to any compelling governmental interest, it
4  violates equal protection.

5        Here, the Ordinance singles out potential contractors who are affiliated with
6  NRA—an organization for which the City has expressed its utter disdain—and
7  compels them to disclose that affiliation or lose contracts with the City. And, when
8  they do disclose, they risk losing contracts *because* of that affiliation. Other
9  contractors need not disclose their private affiliations to the City where those
10 affiliations are political and have no connection to their contracts. Indeed, City
11 contractors are allowed to participate in all kinds of political expression, but those
12 that wish to support NRA are branded with a scarlet letter. The City does not ask for
13 this information from other contractors because they are targeting NRA, which they
14 do not like, to stop their influence. Req. Jud. Notice, Ex. 3 at 1-2. As described
15 above, the City has no legitimate interest—let alone a compelling one—in the
16 information it seeks or in discriminating against NRA-affiliated contractors in this
17 way. *See supra* pp. 13-14.

18       But even if it did have some broader public safety interest in its contractors'
19 associations with NRA, the Ordinance neither serves that interest nor is narrowly
20 tailored to it. Again, only at the most abstract level could the City's disclosure
21 requirement be said to serve any public safety interest at all. Indeed, any money that
22 City contractors might spend on their support of NRA is so far removed from the
23 City's interest in promoting gun safety, generally, and any incident of gun violence,
24 specifically, that it can hardly be said to have any relation at all. *See supra* pp. 13-14.

25       Because the City cannot prove that the Ordinance is narrowly tailored to serve
26 a compelling government interest, its disclosure requirement violates equal protection
27 and should be enjoined.

28 / / /

19

## II.   THE REMAINING PRELIMINARY INJUNCTION FACTORS DEMAND RELIEF

### A.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

If this Court finds that Plaintiffs are likely to succeed on at least one of their claims, the remaining preliminary injunction factors follow readily. For "it is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod*, 427 U.S. at 373). When the burdened expression is political, "[t]he harm is particularly irreparable." *Klein*, 584 F.3d at 1208. And because contractors are currently forced to comply with the Ordinance, Barvir Decl., Ex. 31, the threat to speech is real and the need to "preserve the status quo pending a determination of the action on the merits" is particularly strong. *Chalk*, 840 F.2d at 704.

### B.   Preliminary Relief Is in the Public Interest

Similarly, when challenging state action that affects constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the law." *Klein*, 584 F.3d at 1208. Indeed, because "all citizens have a stake in upholding the Constitution," it is of imperative that the Court weigh heavily in favor of upholding those constitutional rights. *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Plaintiffs seek to enjoin the Ordinance because it violates their fundamental rights under the First and Fourteenth Amendments. And because the City has *always* operated without notice from contractors about their affiliation with NRA without endangering public safety, the City has no plausible argument that temporarily enjoining the Ordinance will endanger public safety. The public interest thus weighs heavily in favor of preserving the status quo until the Court has decided the merits of Plaintiffs' case.

### C.   The Balance of the Equities Tips in Favor of Injunctive Relief

Unlike the irreparable harm the Ordinance imposes on Plaintiff Doe and Plaintiff NRA and its members, a preliminary injunction poses no risk of irreparable harm to the City's legitimate interest. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (holding that the government "does not have an

20

interest in enforcing a law that is likely constitutionally infirm"); *see also Silvester v. Harris*, No. 11-cv-2137, 2014 WL 6611592, at *2 (E.D. Cal. Nov. 20, 2014) ("When the state is asserting harm, there is no interest in enforcing an unconstitutional law.") The "balance of hardships between parties" thus tips in Plaintiffs' favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). Indeed, the scales tip decisively in favor of issuing preliminary relief. *See ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) ("[T]hreatened injury to [constitutional rights] outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute." (citation omitted)).

## CONCLUSION

The Ordinance's true aim is the suppression of First Amendment protected association and expression of NRA and its members and supporters. Contractors faced with the choice of abandoning their NRA affiliation or foregoing a paycheck from one of the largest cities in the country must choose between their livelihood or their political self-expression. The government has no business putting its citizens to that choice. Indeed, as explained above the constitution forbids it. The likelihood of prevailing on this claim is certainly high enough to warrant preliminarily enjoining its enforcement.

For these reasons, the Court should grant Plaintiffs' Motion for a Preliminary Injunction and enjoin enforcement of the Ordinance while this case proceeds.

Dated: May 24, 2019                    **MICHEL & ASSOCIATES, P.C.**

                                       */s/ Anna M. Barvir*
                                       Anna M. Barvir
                                       Counsel for Plaintiffs

21

MEMORANDUM OF POINTS & AUTHORITIES

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name:  *National Rifle Association, et al., v. City of Los Angeles, et al.*
Case No:       2:19-cv-03212 SVW (GJSx)

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

     I am not a party to the above-entitled action. I have caused service of:

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Benjamin F. Chapman
Los Angeles City Attorney
200 N. Main St., Suite 675
Los Angeles, CA 90012
benjamin.chapman@lacity.org
    *Attorneys for Defendants*

     I declare under penalty of perjury that the foregoing is true and correct.

Executed May 24, 2019.

                            */s/ Laura Palmerin*
                            Laura Palmerin