# EXHIBIT 27

**Subscribe**    **Past Issues**    **Translate ▼**

View this email in your browser



Friends:

The City Council on Tuesday approved an ordinance, a first for any municipality, directing prospective City contractors to disclose ties with the National Rifle Association (NRA) and any of its subsidiaries.

I originally introduced the legislation in September of 2018 to highlight the violent extremism of the NRA leadership and publicly disclose any financial relations between the NRA and its subsidiaries who wish to do business with the City of Los Angeles.

As we remember the mass shooting at Marjory Stoneman Douglas High School in Florida one year ago, we must continue to keep in mind that the NRA continues to spend millions of dollars at every level of government to block any type of gun safety legislation anywhere. This is the NRA leadership's agenda despite overwhelming majorities of Republicans, Democrats, and even NRA members who support gun safety legislation. Our residents deserve transparency related to any ties the NRA may have to the City of Los Angeles.

The ordinance will require contractors, through a signed affidavit, to disclose connections with the gun lobby. I want to thank my colleagues who voted unanimously on my initiative. And I especially want to thank Councilmember Paul Krekorian who worked on the item in his *Budget and Finance* Committee.

The policy we adopted was also made possible because of the advocacy of the following groups: Everytown for Gun Safety, Women Against Gun Violence, Moms Demand Action, the Los Angeles Chapter of the Brady Campaign,

Subscribe    Past Issues                                                          Translate ▼

My goal is to get similar legislation adopted in every municipality across the state of California.

Regards,

*Mitch*

**MITCH O'FARRELL**

---

# RSVP: COUNCILMEMBER IN YOUR CORNER



GLASSELL PARK – Our 50th Councilmember in Your Corner is  taking place on **Saturday, February 23rd, 9:30 a.m., at Irving STEAM Magnet School, 3010 Estara Avenue, Glassell Park, 90065**. This month we'll gather to meet our neighbors as well as partner with several organizations to help beautify the neighborhood. We'll see you then!

RSVP HERE

---

# HEADLINES

LA passes law for new businesses to disclose ties with NRA [Newsweek]

City Council approves ban on sale of fur products [Beverly Press]

Subscribe       Past Issues                                                                    Translate ▼

## TEAM MITCH MAKING A DIFFERENCE



HOLLYWOOD - The Council District 13 Clean Team is working to ensure that our neighborhoods are clear of trash and debris. Earlier this week, the crew serviced this area and other hot spots along the Melrose Avenue corridor. See an area that needs attention? Contact our district office at 213-207-3015.

SEE MORE BEFORE AND AFTER PHOTOS

## SKATE PARK GROUNDBREAKING

Subscribe     Past Issues     Translate ▼



ATWATER VILLAGE – Local residents joined Councilmember O'Farrell and the Department of Recreation and Parks to break ground on the new Chevy Chase Skate Park! Exactly two years ago, local resident Gerardo Rivera met with the Councilmember to share an idea to give local youth the opportunity to enjoy the sport that gave him focus when he was growing up in the neighborhood. O'Farrell identified the funding and worked with Recreation and Parks architect Craig Raines on a plan! The facility is set to open late Spring.

# FREE BIKE LIGHTS

Subscribe      Past Issues                                                    Translate ▾



EAST HOLLYWOOD – Councilmember O'Farrell continued his annual tradition with the Los Angeles County Bicycle Coalition to distribute free bike lights! A recent "Operation Firefly" took place at the Western Avenue and Hollywood Blvd Metro Station. Thank you to the volunteers who work to ensure that our cyclists are riding legally and with the proper lights!

## MADE IN HOLLYWOOD HONORS

Subscribe    Past Issues                                                    Translate ▼



CITY HALL - The City Council shined the spotlight on "*A Star is Born,*" "*Vice,*" "*Incredibles 2,*" "*Ralph Breaks the Internet,*" and "*Spider-man, Into the Spider-verse*" during the 8th Annual Made in Hollywood Honors (MIHH). Councilmember O'Farrell partners with six major entertainment organizations to recognize Oscar® nominees that support production and thousands of jobs in Hollywood and throughout California. Thank you for keeping Angelenos home with their families, and best of luck to the nominees!

# THANK YOU CITY FAMILY!



FRIENDSHIP AUDITORIUM – Every year, Councilmember O'Farrell hosts a lunch for staff of the various City departments who work with our office to provide exceptional service to residents of the 13th Council District. Thank you for all you do to help make things happen in our great city!

# PROFESSIONAL CLOTHING DRIVE

**Subscribe**   **Past Issues**                                                           **Translate ▼**



LOS ANGELES - The Office of Councilmember Mitch O'Farrell is partnering with *Clothes the Deal* on a professional clothing drive to benefit job seekers in need. Please drop off gently used business attire at our Echo Park district office, 1722 Sunset Blvd, in Echo Park, through February 20.

# PHOTO OF THE WEEK

Subscribe     Past Issues                                                          Translate ▾



Los Angeles - Thank you to the Los Angeles Fire Department for keeping our neighborhoods safe!

FOLLOW MITCH ON INSTAGRAM

    

*Copyright © 2019 Councilmember Mitch O'Farrell, All rights reserved.*

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

# EXHIBIT 28



The Institute for Legislative Action (ILA) is the lobbying arm of the NRA. Established in 1975, ILA is committed to preserving the right of all law-abiding individuals to purchase, possess and use firearms for legitimate purposes as guaranteed by the Second Amendment to the U.S. Constitution.

ILA's ability to fight successfully for the rights of America's law-abiding gun owners directly reflects the support of NRA's 5 million members—a number that has more than tripled since 1978. When restrictive "gun control" legislation is proposed at the local, state or federal level, NRA members and supporters are alerted and respond with individual letters, faxes, e-mails and calls to their elected representatives to make their views known.

In 1986, the NRA and millions of gun owners nationwide applauded as the Firearms Owners' Protection Act was signed into law by President Ronald Reagan. ILA worked for more than a decade to secure passage of that historic legislation to reform the Gun Control Act of 1968.

**Combined with the strong grassroots efforts of NRA members and NRA-affiliated state associations and local gun clubs, the Institute has worked vigorously to pass pro-gun reform legislation at the state level.**

These efforts include enacting laws that recognize the right of honest citizens to carry firearms for self-protection; preemption bills to prevent attacks on gun owner rights by local anti-gun politicians, and fighting for legislation to prevent the bankrupting of America's firearms industry through reckless lawsuits.

The Institute is also involved in educating the public about the facts concerning the many facets of firearms ownership in America. Through the distribution of millions of printed fact sheets, brochures and articles annually and the posting information and the latest news daily on its Internet site (www.nraila.org), the Institute provides facts about responsible firearms ownership, the Second Amendment and other topics.

In NRA Headquarters in Fairfax, Va., and in offices in Washington, D.C., and in Sacramento, Calif., the Institute employs a staff of more than 80, with a team of full-time lobbyists defending Second Amendment issues on Capitol Hill, in state legislatures and in local government bodies.

While NRA is a single-issue organization, the Institute is involved in any issue that directly or indirectly affects firearms ownership and use. These involve such topics as hunting and access to hunting lands, wilderness and wildlife conservation, civilian marksmanship training and ranges for public use, law enforcement-related issues, product liability, trapping, crime victim rights and criminal justice reform.

# EXHIBIT 29




*Recommendations and Reports*

**October 3, 2003 / 52(RR14);11-20**

Persons using assistive technology might not be able to fully access information in this file. For assistance, please send e-mail to: mmwrq@cdc.gov. Type 508 Accommodation and the title of the report in the subject line of e-mail.

# First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws

## Findings from the Task Force on Community Preventive Services

Prepared by

Robert A. Hahn, Ph.D.[1]
Oleg O. Bilukha, M.D., Ph.D.[1]
Alex Crosby, M.D.[2]
Mindy Thompson Fullilove, M.D.[3]
Akiva Liberman, Ph.D.[4]
Eve K. Moscicki, Sc.D.[5]
Susan Snyder, Ph.D.[1]
Farris Tuma, Sc.D.[5]
Peter Briss, M.D.[1]

[1]*Division of Prevention Research and Analytic Methods*
*Epidemiology Program Office*
[2]*Division of Violence Prevention*
*National Center for Injury Prevention and Control, CDC*
*Atlanta, Georgia*
[3]*New York State Psychiatric Institute, Columbia University*
*New York, New York*
[4]*National Institute of Justice*
*U.S. Department of Justice*
*Washington, D.C.*
[5]*National Institute of Mental Health*
*National Institutes of Health*
*Bethesda, Maryland*

The material in this report was prepared by the Epidemiology Program Office, Stephen B. Thacker, M.D., Director; Division of Prevention Research and Analytic Methods, Richard E. Dixon, M.D., Director.

### Summary

*During 2000--2002, the Task Force on Community Preventive Services (the Task Force), an independent nonfederal task force, conducted a systematic review of scientific evidence regarding the effectiveness of firearms laws in preventing violence, including violent crimes, suicide, and unintentional injury. The following laws were evaluated: bans on specified firearms or ammunition, restrictions on firearm acquisition, waiting periods for firearm acquisition, firearm registration and licensing of firearm owners, "shall issue" concealed weapon carry laws, child*

*access prevention laws ... *[text partially obscured by header]... *. The Task Force found insufficient evidence to determine the effectiveness of any of the firearms laws or combinations of laws reviewed on violent outcomes. (Note that insufficient evidence to determine effectiveness should not be interpreted as evidence of ineffectiveness.) This report briefly describes how the reviews were conducted, summarizes the Task Force findings, and provides information regarding needs for future research.*

## Background

Although firearms-related* injuries in the United States have declined since 1993, they remained the second leading cause of injury mortality in 2000, the most recent year for which complete data are available (*1*). Of 28,663 firearms-related deaths in 2000 --- an average of 79 per day---16,586 (57.9%) were suicides, 10,801 (37.7%) were homicides, 776 (2.7%) were unintentional, and an additional 500 (1.7%) were legal interventions or of undetermined intent.

An estimated 24.3% of the 1,430,693 violent crimes (murder, aggravated assault, rape, and robbery) committed in the United States in 1999 were committed with a firearm (*2*). In the early 1990s, rates of firearms-related homicide, suicide, and unintentional death in the United States exceeded those of 25 other high-income nations (i.e., 1992 gross national product US $8,356 per capita) for which data are available (*3*). In 1994, the estimated lifetime medical cost of all firearms injuries in the United States was $2.3 billion (*4*).

Approximately 4.5 million new firearms are sold each year in the United States, including 2 million handguns. In addition, estimates of annual secondhand firearms transactions (i.e., sales, trades, or gifts) range from 2 million to 4.5 million (*5,6*). Further, an estimated 0.5 million firearms are stolen annually (*6*). Thus, the total number of firearms transactions could be as high as 9.5 million per year.

The 1994 National Survey of the Private Ownership of Firearms (NSPOF), conducted by Chilton Research Services for the Police Foundation, under sponsorship of the National Institute of Justice, indicated that American adults owned approximately 192 million working firearms, an average of one per adult (*7*). The NSPOF also indicated that firearm ownership was unevenly distributed in the population: only 24.6% of U.S. adults owned a firearm (41.8% of men and 9.0% of women). Another survey (*2*) found that 41% of adult respondents reported having a firearm in their home in 1994, and 35% did so in 1998. A third survey (*8*) reported that 35% of homes with children aged <18 years had at least one firearm. Rates of firearm ownership in the United States also exceed those of 14 other nations for which data are available, with the exception of Finland (*9*).

Of the estimated 192 million firearms owned in the United States at the time of the 1994 NSPOF survey, 65 million were handguns; 70 million, rifles; 49 million, shotguns; and the remainder were other guns (*7*). Among handgun owners, 34.0% kept their guns loaded and unlocked. An estimated 10 million handguns, one sixth of the handguns owned, were regularly carried by their owners, approximately half in the owners' cars and the other half on the owners' persons.

The manufacture, distribution, sale, acquisition, storage, transportation, carrying, and use of firearms in the United States are regulated by a complex array of federal, state, and local laws and regulations. This review examines firearms laws as one of many approaches to reducing firearms violence (*10,11*).

## Introduction

The independent, nonfederal Task Force on Community Preventive Services (the Task Force) is developing the *Guide to Community Preventive Services* (the *Community Guide*) with the support of the U.S. Department of Health and Human Services (DHHS) in collaboration with public and private partners. Although CDC provides staff support to the Task Force for development of the *Community Guide*, the conclusions presented in this report were developed by the Task Force and are not necessarily the conclusions of DHHS or CDC.

This report is one in a series of topics included in the *Community Guide*, a resource that includes multiple systematic reviews, each focusing on a preventive health topic. A short overview of the process used by the Task Force to select and review evidence and summarize its findings is included in this report. A full report on the findings and additional evidence (including discussions of possible additional benefits, potential harms, existing data problems, research gaps, and directions for future research) will be published in the *American Journal of Preventive Medicine*.

The *Community Guide's* methods for conducting systematic reviews and linking evidence to recommendations have been described elsewhere (*12*). In brief, for each *Community Guide* topic, a multidisciplinary team (the systematic review development team) conducts a review consisting of the following steps:

- developing an approach to organizing, grouping, and selecting the interventions to be reviewed;
- systematically searching for and retrieving evidence;
- assessing the quality of and summarizing the strength of the body of evidence of effectiveness;
- assessing cost and cost-effectiveness evidence, identifying applicability and barriers to implementation (if the effectiveness of the intervention has been established);
- summarizing information regarding evidence of other effects; and
- identifying and summarizing research gaps.

Firearms laws were identified as high-priority interventions for violence prevention review in April 1997 by a group of consultants[†] representing diverse experience. The group generated a comprehensive list of strategies and created a priority list of interventions for review on the basis of 1) the potential to reduce violence in the U.S. population; 2) the potential benefits of expanding use of seemingly effective, but underutilized, interventions and reducing use of seemingly ineffective, but overutilized, interventions; 3) current interest in this intervention among potential audiences; and d) diversity of intervention types.

The interventions included in this review address several of the objectives outlined in *Healthy People 2010* (*13*), the disease prevention and health promotion agenda for the United States. Many of the *Healthy People 2010* objectives outlined in Chapter 15, "Injury and Violence Prevention," relate to firearms laws and their proposed effects on violence-related outcomes ([Box]).

To be included in the review of effectiveness, studies had to 1) be a primary evaluation of the selected intervention rather than, for example, a guideline or review; 2) provide information on at least one outcome of interest from the list of violent outcomes preselected by the systematic review development team; 3) be conducted in Established Market Economies[§]; and 4) compare outcomes in groups of persons exposed to the intervention with outcomes in groups of persons not exposed or less exposed to the intervention (whether the comparison was concurrent between groups or before-and-after within the same group).

Electronic searches for any research published before July 2001 were conducted in MEDLINE, EMBASE, ERIC, National Technical Information Service (NTIS), PsychINFO, Sociological Abstracts, National Criminal Justice Reference Service (NCJRS), Public Affairs Information Service (PAIS), Criminal Justice Index, and Gale Group Legal Research Index.[¶] The references listed in all retrieved articles were also reviewed, and specialists on the systematic review development team and elsewhere were consulted to identify additional reports. Journal articles, government reports, books, and book chapters were included in this review.

Because the purpose of this review was to assess the effectiveness of firearms laws in preventing violence, studies of firearms laws were reviewed only if they assessed at least one violent outcome. The outcome measures evaluated to determine the effect of each intervention were violent crimes (i.e., murder, aggravated assault, robbery, and rape), suicide, and unintentional firearm injury. Aggravated assault was considered a health-related outcome insofar as it is "an unlawful attack by one person upon another for the purpose of inflicting severe or aggravated bodily injury" (*2*). Similarly, robbery was considered a health-related outcome insofar as it is "the taking or attempting to take anything of value from the care, custody, or control of a person or persons by force or threat of force or violence or by putting the victim in fear" (*2*). For each of the firearms laws, the team developed an analytic framework indicating possible causal links between that intervention and one or more of the predefined outcomes of interest.

Each study meeting the inclusion criteria was evaluated with a standardized abstraction form (*14*) and was assessed for suitability of study design and threats to validity (*12*). On the basis of the number of threats to validity, studies were characterized as having good, fair, or limited execution. Results for each outcome of interest were obtained from each study that met the minimum quality criteria. Measures that were adjusted for the effects of potential confounders were used in preference to crude effect measures. If two or more studies of a firearms law overlapped in

terms of population frequency of violent events, studies that yielded an effect estimate with the fewest execution flaws and the best design to represent effects of the intervention.

A median was calculated as a summary effect measure for each outcome of interest. For bodies of evidence consisting of seven or more studies, an interquartile range was calculated as an index of variability. Unless otherwise noted, the results of each study were represented as a point estimate for the relative change in the violent outcome rate associated with the intervention.

The body of evidence of effectiveness was characterized as strong, sufficient, or insufficient on the basis of the number of available studies, the suitability of study designs for evaluating effectiveness, the quality of execution of the studies, the consistency of the results, and the median effect size (*12*).

The *Community Guide* uses systematic reviews to evaluate the evidence of intervention effectiveness, and the Task Force makes recommendations based on the findings of these reviews. The strength of each recommendation is based on the strength of the evidence of effectiveness (i.e., the Task Force can recommend an intervention [or recommend against its use] on the basis of strong evidence of effectiveness or sufficient evidence of effectiveness** [*12*]). Other types of evidence can also affect a recommendation. For example, evidence that harms from an intervention outweigh improved outcomes might lead to a recommendation against use of the intervention. If interventions are found to be effective, they are evaluated for cost effectiveness by using economic evaluation guidelines developed for the *Community Guide* (*15*). Because none of the firearm laws reviewed was found to have sufficient evidence to draw conclusions regarding their effectiveness, no economic reviews were conducted.

A finding of insufficient evidence to determine effectiveness should not be interpreted as evidence of ineffectiveness but rather as an indicator that additional research is needed before an intervention can be evaluated for its effectiveness.

# Results

The systematic review development team identified 51 studies that evaluated the effects of selected firearms laws on violence and met the inclusion criteria for this review. No study was excluded because of limitations in design or execution. Information on violent outcomes was available in 48 studies, and the remaining three studies, which provided information on counts or proportions of regulated firearms used in crime, were used as supplementary evidence. Several studies examined more than one type of firearm law.

Several separate studies evaluated effects of the same law in the same populations during overlapping time periods. Such studies were considered nonindependent, and effect estimates from the best study in the group (as determined by the quality of design and execution and the length of the follow-up period) were chosen to represent the effects of the intervention. The total number of studies for each intervention, and the number of studies that actually contributed effect estimates to the body of evidence, are listed (Table). More extensive evidence tables will be available at http://www.thecommunityguide.org when the full evidence review is published.

Evidence was insufficient to determine the effectiveness of any of these laws for the following reasons.

- **Bans on specified firearms or ammunition.** Results of studies of firearms and ammunition bans were inconsistent: certain studies indicated decreases in violence associated with bans, and others indicated increases. Several studies found that the number of banned guns retrieved after a crime declined when bans were enacted, but these studies did not assess violent consequences (*16,17*). Studies of the 1976 Washington, D.C. handgun ban yielded inconsistent results (*18--20*). Bans often include "grandfather" provisions, allowing ownership of an item if it is acquired before the ban, complicating an assessment of causality. Finally, evidence indicated that sales of firearms to be banned might increase in the period before implementation of the bans (e.g., the Assault Weapons Ban of 1994) (*21*).
- **Restrictions on firearm acquisition.** The federal government and individual states restrict the acquisition and use of firearms by individuals on the basis of their personal history. Reasons for restriction can include prior felony conviction, conviction of misdemeanor intimate partner violence, drug abuse, adjudication as "mentally defective,"[††] and other characteristics (e.g., specified young age). The Brady Law (*22*) established national restrictions on acquisition of firearms and ammunition from federal firearms licensees. The interim Brady Law

enacted in 1998, eliminated the required waiting period. NICS normally allows 3 days for a background check, after which, if no evidence of a prohibited characteristic is found, the purchase may proceed (*23*). Certain states have established additional restrictions, and some require background checks of all firearms transactions, not only those conducted by federal firearms licensees.

The permanent Brady Law depends on the National Instant Criminal Background Check System (NICS). However, NICS lacks much of the required background information, particularly on certain restriction categories (*23*). Efforts to improve the availability of background information have been supported by the National Criminal History Improvement Program (*24*). Approximately 689,000 applications to acquire a firearm (2.3% of 30 million applications) were denied under the Brady Law from its first implementation in 1994 through 2000 (*25*); the majority of denials were based on the applicant's criminal history. However, denial of an application does not always stop applicants from acquiring firearms through other means.

Overall, evaluations of the effects of acquisition restrictions on violent outcomes have produced inconsistent findings: some studies indicated decreases in violence associated with restrictions, and others indicated increases. One study indicated a statistically significant reduction in the rate of suicide by firearms among persons aged >55 years; however, the reduction in suicide by all methods was not statistically significant. Furthermore, this benefit appears to have been a consequence of the waiting period imposed by the interim Brady Law (which has since been dropped in the permanent law) rather than of the law's restrictions on the basis of the purchaser's characteristics (*26*).

- **Waiting periods for firearm acquisition.** Waiting periods for firearm acquisition require a specified delay between application for and acquisition of a firearm. Waiting periods have been established by the federal government and by states to allow time to check the applicant's background or to provide a "cooling-off" period for persons at risk of committing suicide or impulsive acts against others. Studies of the effects of waiting periods on violent outcomes yielded inconsistent results: some indicated a decrease in violent outcome associated with the delay and others indicated an increase. As noted previously, one study of the interim Brady Law indicated a statistically significant reduction in firearms suicide among persons aged >55 years associated with the waiting period requirement of the interim law. Several studies suggested a partial "substitution effect" for suicide (i.e., decreases in firearms suicide are accompanied by smaller increases in suicide by other means) (*26*).

- **Firearm registration and licensing of owners.** Registration requires that a record of the owner of specified firearms be created and retained (*27*). At the national level, the Firearm Ownership Protection Act of 1986 specifically precludes the federal government from establishing and maintaining a registry of firearms and their owners. Licensing requires an individual to obtain a license or other form of authorization or certification to purchase or possess a firearm (*27*). Licensing and registration requirements are often combined with other firearms regulations, such as safety training or safe storage requirements. Only four studies examined the effects of registration and licensing on violent outcomes; the findings were inconsistent.

- **"Shall issue" concealed weapon carry laws.** Shall issue concealed weapon carry laws (shall issue laws) require the issuing of a concealed weapon carry permit to all applicants not disqualified by specified criteria. Shall issue laws are usually implemented in place of "may issue" laws, in which the issuing of a concealed weapon carry permit is discretionary (based on criteria such as the perceived need or moral character of the applicant). A third alternative, total prohibition of the carrying of concealed weapons, was in effect in six states in 2001.

  The substantial number of studies of shall issue laws largely derives from and responds to one landmark study (*28*). Many of these studies were considered to be nonindependent because they assessed the same intervention in the same population during similar time periods. A review of the data revealed critical problems, including misclassification of laws, unreliable county-level crime data, and failure to use appropriate denominators for the available numerator crime data (*29*). Methodological problems, such as failure to adjust for autocorrelation in time series data, were also evident. Results across studies were inconsistent or conceptually implausible. Therefore, evidence was insufficient to determine the effect of shall issue laws on violent outcomes.

- **Child access prevention laws.** Child access prevention (CAP) laws are designed to limit children's access to and use of firearms in homes. The laws require firearms owners to store their firearms locked, unloaded, or both, and make the firearm owners liable when children use a household firearm to threaten or harm themselves or others. In three states with CAP laws (Florida, Connecticut, California), this crime is a felony; in several others it is a misdemeanor.

  Only three studies examined the effects of CAP laws on violent outcomes, and only one outcome, unintentional firearms deaths, was assessed by all three. Of these, two studies assessed the same states over the same time

period (29). In the United States, independent research that included the states that were the first to pass CAP laws and had the longest follow-up time, indicated that the apparent reduction in unintentional firearm deaths associated with CAP laws that carry felony sanctions was statistically significant only in Florida and not in California or Connecticut (*30*). Overall, too few studies of CAP law effects have been done, and the findings of existing studies were inconsistent. In addition, although CAP laws address juveniles as perpetrators of firearms violence, available studies assessed only juvenile victims of firearms violence.

- **Zero tolerance laws for firearms in schools.** The Gun-Free Schools Act (*31*) stipulates that each state receiving federal funds must have a state law requiring local educational agencies to expel a student from school for at least 1 year if a firearm is found in the student's possession at school. Expulsion may lead to alternative school placement or to "street" placement (full expulsion, with no linkage to formal education). In contrast to the 3,523 firearms reported confiscated under the Gun-Free Schools Act in the 1998--99 school year, school surveys (*32*) indicate that an estimated 3% of the 12th grade student population in 1996 (i.e., 85,350 students) reported carrying firearms on school property one or more times in the previous 30 days. Thus, even if only 12th grade students carry firearms, fewer than 4.3% of firearms are being detected in association with the Gun-Free Schools Act.

  No study reviewed attempted to evaluate the effects of zero tolerance laws on violence in schools, nor did any measure the effect of the Gun-Free Schools Act on carrying of firearms in schools. One cross-sectional study, however, assessed the effectiveness of metal detector programs in reducing the carrying of firearms in schools (*33*). Although firearms detection is not explicitly required in the Gun-Free Schools Act, the effectiveness of the law may depend on the ability to detect firearms by various means. The study reported that schools with and without metal detectors did not differ in rates of threatening, fights, or carrying of firearms outside of school, but the rate of carrying firearms to, from, or in schools with detection programs was half that of schools without such programs. The effectiveness of zero tolerance laws in preventing violence cannot be assessed because appropriate evidence was not available. A further concern is that "street" expulsion might result in increased violence and other problems among expelled students.

- **Combinations of firearms laws.** Governmental jurisdictions (e.g., states or nations) can be characterized by the degree to which they regulate firearm possession and use. Whether a greater degree of firearms regulation in a jurisdiction results in a reduction of the amount of violence in that jurisdiction still needs to be determined. Three kinds of evidence were reviewed for this study: 1) studies of the effects of comprehensive national laws within nations; 2) international comparisons of comprehensive laws; and 3) studies in which law types within jurisdictions (i.e., regulation of specific, defined aspects of firearm acquisition and use) were categorized and counted, and counts compared with rates of specific forms of violence within the same jurisdictions. The latter type are referred to here as index studies because they developed indices of the degree of regulation. In drawing conclusions about law combinations, findings from the three approaches were considered.

  On the basis of national law assessments (the Gun Control Act of 1968 in the United States and the Criminal Law Amendment Act of 1977 in Canada), international comparisons (between the United States and Canada), and index studies (all conducted within the United States), available evidence was insufficient to determine whether the degree of firearms regulation was associated with decreased (or increased) violence. The findings were inconsistent and most studies were methodologically inadequate to allow conclusions about causal effects. Moreover, as conducted, index studies, even if consistent, would not allow specification of which laws to implement.

In summary, the Task Force found insufficient evidence to determine the effectiveness of any of the firearms laws reviewed for preventing violence. References and key findings are listed (Table).

## Research Needs

The Task Force's review of firearms laws found insufficient evidence to determine whether the laws reviewed reduce (or increase) specific violent outcomes (Table). Much existing research suffers from problems with data, analytic methods, or both. Further high-quality research is required to establish the relationship between firearms laws and violent outcomes. Potential areas for further investigation will be discussed in detail in an upcoming article in the *American Journal of Preventive Medicine*.

Several recurring problems were associated with the studies that evaluated the effects of firearms laws on violent outcomes:

- The assessment of effects of laws is most often performed at the State or county level, but the effect of state laws may be diluted in some areas of a state and magnified in others. Furthermore, state-level assessments of effect conceal the possibility that some firearms laws are more effective in some states than in others. This is common in these studies and may occur in others as well. As with all interventions, assessing the degree of implementation of laws may be important in evaluating their effects; yet this has not been a part of law evaluations. Better information regarding implementation might allow more sophisticated explanation of inconsistent effects.
- Several facets of the measurement of violent outcomes have been problematic. Crime data are substantially underreported and, at the county level, may not be sufficiently reliable for research purposes (*29*). In addition, selected outcome measures are often not directly relevant to the law being assessed (e.g., the evaluation of child access prevention laws by measurement of juvenile victims [rather than perpetrators] and the evaluation of shall issue laws by the measurement of crimes occurring in the home [where the law does not apply]). Another problem is that crime data are often aggregated, so that the circumstances of violent events cannot be determined. Aggregated data hinder the assessment of the ways in which laws might and might not work. Individual record data systems currently being implemented --- the National Incident-Based Reporting System of the FBI and the National Violent Death Reporting System of CDC and partners --- might resolve some of these difficulties and greatly facilitate the evaluation of firearms laws.
- The measurement of potential confounders has been a challenge in evaluating the effects of firearms laws. Potentially important confounders include socioeconomic status and poverty, drug cycles, gang activity, and the intensity of law enforcement. Measuring these phenomena is difficult and requisite data are often not available. In addition, endogeneity (i.e., the presence of common characteristics, such as crime counts, as both dependent and independent variables in equations) has been a problem in firearms law evaluations.
- Study designs and analytic techniques used in firearms law evaluations have been problematic. Rates of violence may affect the passage of firearms laws and firearms laws may then affect rates of violence; knowledge of temporal sequence is thus critical in separating cause and effect, and cross-sectional studies are at a disadvantage. Time series analyses of firearms laws and violent outcomes have not consistently adjusted for temporal and spatial autocorrelation, and thus may have exaggerated hypothesized associations. Additionally, firearms studies often fail to note potential biases associated with measurement of outcomes not directly associated with the law in question (e.g., using victims rather than agents of violence in the assessment of CAP laws).

In conclusion, the application of imperfect methods to imperfect data has commonly resulted in inconsistent and otherwise insufficient evidence with which to determine the effectiveness of firearms laws in modifying violent outcomes.

This is a critical period for focused research on the effectiveness of firearms laws in reducing violence in the United States. International comparisons indicate that the United States is an outlier among developed, industrialized nations in rates of firearms violence (*2*). Widespread public concern exists about criminal firearms violence, firearms violence among youth, and other forms of firearms violence, and popular support for many firearms laws is evident (*34,35*). Although the Task Force's systematic review of the existing literature on firearms laws found insufficient evidence to determine the effectiveness of these laws in preventing violence, research should continue on the effectiveness of firearms laws as one approach to the prevention or reduction of firearms violence and firearms injury. Evaluation should include not only the laws reviewed here, but the broad array of other federal, state, and local laws.

## Additional Information Regarding the *Community Guide*

In addition to the firearms laws reviewed in this report, reviews for the *Community Guide* have been completed on the effectiveness of preventing violence through early childhood home visitation (*36*) and therapeutic foster care (to be published in the near future). Reviews of several other violence prevention interventions are pending or under way, including the effects of school-based, social and emotional skill learning programs, and the treatment of juveniles as adults in the justice system.

*Community Guide* topics are prepared and released as each is completed. The findings from systematic reviews on vaccine-preventable diseases, tobacco use prevention and reduction, motor vehicle occupant injury, physical activity, diabetes, oral health, and the social environment have been published. A compilation of systematic reviews will be published in book form in 2004. Additional information regarding the Task Force, the C*ommunity Guide*, and a list of published articles is available at http://www.thecommunityguide.org.

# References

1. Miniño AM, Arias E, Kochanek KD, Murphy SL, Smith BL. Deaths: final data for 2000. Washington, DC: US Department of Health and Human Services, CDC, National Center for Health Statistics, 2002. (National vital statistics reports; vol. 50, no. 15). Available at http://www.cdc.gov/nchs/data/nvsr/nvsr50/nvsr50_15.pdf.

2. Bureau of Justice Statistics. Sourcebook of criminal justice statistics 2000. Washington, DC: US Department of Justice, Bureau of Justice Statistics, 2001.

3. Krug EG, Powell KE, Dahlberg LL. Firearm-related deaths in the United States and 35 other high- and upper-middle-income countries. Int J Epidemiol 1998;27:214--21.

4. Cook PJ, Lawrence BA, Bruce A, Ludwig J, Miller TR. The medical costs of gunshot injuries in the United States. JAMA 1999;282:447--54.

5. Bureau of Alcohol Tobacco and Firearms. Commerce in firearms in the United States. Washington, DC: US Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 2000.

6. Cook PJ, Molliconi S, Cole TB. Regulating gun markets. J Criminal Law Criminol 1995;86:59--92.

7. Cook PJ, Ludwig J. Guns in America: results of a comprehensive national survey on firearms ownership and use. Washington, DC: US Department of Justice, National Institute of Justice, 1996.

8. Schuster MA, Franke TM, Bastian AM, Sor S, Halfon N. Firearm storage patterns in US homes with children. Am J Public Health 2000;90:588--94.

9. Cukier W. Firearms regulation: Canada in the international context. Chronic Dis Can 1998;19:25--34.

10. Kellermann AL, Lee RK, Mercy JA, Banton JG. The epidemiologic basis for the prevention of firearm injuries. Annu Rev Public Health 1991;12:17--40.

11. Powell EC, Sheehan KM, Christoffel KK. Firearm violence among youth: public health strategies for prevention. Ann Emerg Med 1996;28:204--12.

12. Briss PA, Zaza S, Pappaioanou M, et al. Developing an evidence-based Guide to Community Preventive Services---methods. Am J Prev Med 2000;18(1S):35--43.

13. US Department of Health and Human Services. Healthy people 2010. 2nd ed. With Understanding and Improving Health and Objectives for Improving Health (2 vols). Washington, DC: US Department of Health and Human Services, 2000.

14. Zaza S, Wright-de Aguero LK, Briss PA, et al. Data collection instrument and procedure for systematic reviews in the Guide to Community Preventive Services. Am J Prev Med 2000;18(1S):44--74.

15. Carande-Kulis VG, Maciosek MV, Briss PA, et al. Methods for systematic reviews of economic evaluations for the Guide to Community Preventive Services. Am J Prev Med 2000;18(1S):75--91.

16. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. Am J Public Health 1997;87:297--8.

17. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on crime guns. Inj Prev 999;5:259--63.

18. Loftin C, McDowall D, Wiersma B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med 1991;325:1615--20.

19. Britt CL, Bordua DJ, Kleck G. A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment. Law Soc Rev 1996;30:361--80.

20. McDowall D, Wiersma B, Loftin C. Using quasi-experiments to evaluate firearm laws: comment on Britt et al.'s reassessment of the D.C. gun law. Law Soc Rev 1996;30:381--91.

21. Roth JA, Koper CS. Impacts of the 1994 Assault Weapons Ban: 1994--996. Washington, DC: US Department of Justice, National Institute of Justice, 1999.

22. Public Law 103-159. Brady Handgun Violence Prevention Act, 18 USC, Section 922(t).1995.

23. US General Accounting Office. Gun control: options for improving the National Instant Criminal Background Check System. Washington, DC: US General Accounting Office, Report to Congressional Requesters, April 2000. GAO/GGD-00-56

24. US Department of Justice. Improving criminal history records for background checks. Bureau of Justice Statistics Highlights. Washington, DC: US Department of Justice, February 11, 2002.

25. Bowling M, Lauver G, Gifford SL, Adams DB. Background checks for firearm transfers, 2000. Bureau of Justice Statistics Bulletin. Washington, DC: US Department of Justice, July 2001.

26. Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA 2000;284:585--91.

27. DeFrancesco S, Vernick JS, Weitzel MM, LeBrun EE. A gun policy glossary: policy, legal and health terms. Baltimore, MD: The Johns Hopkins Center for Gun Policy and Research, 2000.

28. Lott JR, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. J Legal Studies 1997;26:1--68.

29. Maltz DM, Targonski JC. A note on the use of county-level UCR data. J Quant Criminol 2002;18:297--318.

30. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. Pediatrics 2000;106:1466--9.

31. Public Law 103-382. Improving America's Schools Act of 1994. 20 USC 8921, Section 14601, Gun-Free Schools Act, 1994.

32. US Department of Education and US Department of Justice. 1999 Annual report on school safety. Washington, DC: U.S. Department of Education and US Department of Justice, 1999. Available at http://www.ed.gov/PDFDocs/InterimAR.pdf

33. Ginsberg C. Violence-related attitudes and behaviors of high school students---New York City, 1992. J Sch Health 1993;63:438--40.

34. Merkle D. America: it's our right to bear arms. ABCNews.com, May 14, 2002. Available at http://abcnews.go.com/sections/us/DailyNews/guns_poll020514.html.

35. Smith TW. Public opinion about gun policies. Future Child 2002;12(2):154--63.

36. CDC. First reports evaluating the effectiveness of strategies for preventing violence: early childhood home visitation. Findings from the Task Force on Community Preventive Services. MMWR 2003;52 (No. RR-14):1-9.

* A firearm is a weapon (e.g., a handgun, rifle, or shotgun) in which a shot is propelled by gunpowder.

† Consultants for the systematic reviews of violence prevention interventions were Laurie Anderson, Ph.D., CDC, Olympia, Washington; Carl Bell, M.D., Community Mental Health Council, Chicago, Illinois; Red Crowley, Men Stopping Violence, Atlanta, Georgia; Sujata Desai, Ph.D., CDC, Atlanta, Georgia; Deborah French, Colorado Department of Public Health and Environment, Denver, Colorado; Darnell F. Hawkins, Ph.D., J.D., University of Illinois at Chicago, Chicago, Illinois; Danielle LaRaque, M.D., Harlem Hospital Center, New York, New York; Barbara Maciak, Ph.D., CDC, Detroit, Michigan; James Mercy, Ph.D., CDC, Atlanta, Georgia; Suzanne Salzinger, Ph.D., New York State Psychiatric Institute, New York, New York; Patricia Smith, M.S., Michigan Department of Community Health, Lansing, Michigan. Other aspects of this review benefited by comments from Phillip Cook, Ph.D., Duke University, Durham, North Carolina; Gary Kleck, Ph.D., School of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida; Jon Vernick, Ph.D., Johns Hopkins University, Baltimore, Maryland; Daniel Webster, Sc.D., Johns Hopkins University, Baltimore, Maryland; James Wright, Ph.D., University of Central Florida, Orlando, Florida; Frank Zimring, J.D., University of California, Berkeley, California.

§ Established Market Economies as defined by the World Bank are Andorra, Australia, Austria, Belgium, Bermuda, Canada, Channel Islands, Denmark, Faeroe Islands, Finland, France, Germany, Gibraltar, Greece, Greenland, Holy See, Iceland, Ireland, Isle of Man, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Spain, St. Pierre and Miquelon, Sweden, Switzerland, the United Kingdom, and the United States.

¶ These databases can be accessed as follows: MEDLINE: http:// www.ncbi.nlm.nih.gov/PubMed; EMBASE: DIALOG http://www.dialogclassic.com (requires id/password account), ScienceDirect: http://www.sciencedirect.com/science/search/database/embase; ERIC: http://www.askeric.org/Eric/; NTIS: DIALOG http://www.dialogclassic.com (requires id/password account), http://grc.ntis.gov/ntisdb.htm; PsycINFO: DIALOG http://www.dialogclassic.com (requires id/password account), http://www.apa.org/psycinfo/products/psycinfo.html; Sociological Abstracts: DIALOG http://dialogclassic.com (requires id/password account), http://www.csa.com/detailsV5/socioabs.html; NCJRS: http://abstractsdb.ncjrs.org/content/AbstractsDB_Search.asp; PAIS: DIALOG http://dialogclassic.com (requires id/password account); Criminal Justice index: DIALOG http://dialogclassic.com (requires id/password account); Gale Group Legal Research Index: DIALOG http://dialogclassic.com (requires id/password account); CINAHL: DIALOG http://www.dialogclassic.com (requires id/password account), http://www.cinahl.com/wpages/login.htm.

** At the June 2002 meeting of the Task Force on Community Preventive Services, new terminology was adopted to reflect the findings of the Task Force. Instead of being referred to as "strongly recommended" and "recommended," such interventions are now referred to as "recommended (strong evidence of effectiveness)" and "recommended (sufficient evidence of effectiveness)," respectively. Similarly, the finding previously referred to as "insufficient evidence" is now more fully stated: "insufficient evidence to determine effectiveness." These changes were made to improve the clarity and the intent of the findings.

†† The term "mentally defective" is a determination by a lawful authority that a person, as a result of marked subnormal intelligence or mental illness, is a danger to self or others, or lacks the mental capacity to manage his or her own affairs. The term also includes a court finding of insanity in a criminal case, incompetence to stand trial, or not guilty by reason of lack of mental responsibility. **Source:** Bureau of Alcohol Tobacco and Firearms. Federal firearms regulations reference guide. Washington, DC: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 2000, ATF P 5300.4 (01-00). Available at http://www.atf.treas.gov/pub/fire-explo_pub/2000_ref.htm.

### Task Force on Community Preventive Services*
November 1, 2002

**Chair:** Jonathan E. Fielding, M.D., Los Angeles Department of Health Services, Los Angeles, California
**Vice-Chair:** Patricia Dolan Mullen, Dr.P.H., University of Texas-Houston School of Public Health, Houston, Texas

**Members:** Ross C. Brownson, Ph.D., St. Louis University School of Public Health, St. Louis, Missouri, Partner for Prevention, Washington, D.C.; Jane L. Delgado, Ph.D., National Alliance for Hispanic Health, Washington, D.C.; Mindy Thompson Fullilove, M.D., New York State Psychiatric Institute and Columbia University, New York, New York; Alan R. Hinman, M.D., Task Force for Child Survival and Development, Atlanta, Georgia; George J. Isham, M.D., HealthPartners, Minneapolis, Minnesota; Garland H. Land, M.P.H., Center for Health Information Management and Epidemiology, Missouri Department of Health, Jefferson City, Missouri; Patricia A. Nolan, M.D., Rhode Island Department of Health, Providence, Rhode Island; Dennis E. Richling, M.D., Union Pacific Railroad, Omaha, Nebraska; Susan C. Scrimshaw, Ph.D., School of Public Health, University of Illinois, Chicago, Illinois; Steven M. Teutsch, M.D., Merck & Company, Inc., West Point, Pennsylvania; Robert S. Thompson, M.D., Department of Preventive Care, Group Health Cooperative of Puget Sound, Seattle, Washington

**Consultants:** Robert S. Lawrence, M.D., Bloomberg School of Public Health, Johns Hopkins University, Baltimore, Maryland; J. Michael McGinnis, M.D., Robert Wood Johnson Foundation, Princeton, New Jersey; Lloyd F. Novick, M.D., Onondaga County Department of Health, Syracuse, New York

* Patricia A. Buffler, Ph.D., University of California, Berkeley; Mary Jane England, M.D., Regis College, Weston, Massachusetts; Caswell A. Evans, Jr., D.D.S., National Oral Health Initiative, Office of the U.S. Surgeon General, Rockville, Maryland; David W. Fleming, M.D., CDC, Atlanta, Georgia; Fernando A. Guerra, M.D., San Antonio Metropolitan Health District, San Antonio, Texas; and Charles S. Mahan, M.D., College of Public Health, University of South Florida, Tampa, Florida, also served on the Task Force while the recommendations were being developed.

**Table**

TABLE. Findings of the Task Force on Community Preventive Services regarding firearms laws and prevention of violence

| Intervention (No. of studies contributing effect estimates) | Task force finding | Intervention description | Key findings |
|---|---|---|---|
| Bans on specified firearms or ammunition (6)* | Insufficient evidence to determine effectiveness† | Prohibit acquisition or possession of certain categories of firearms (e.g., machine guns or assault weapons) or ammunition (e.g., large-capacity magazines). Can also include prohibitions on the manufacture of the specified firearms. Often "grandfather" guns acquired before ban. | Evidence insufficient because of small numbers of studies, inconsistent evidence of effectiveness, and limitations in execution of available studies. Studies of Washington, D.C. handgun ban produced conflicting results that could not be resolved. Bans may lead to pre-ban increases in sales of firearms to be banned. |
| Restrictions on firearm acquisition (4)§ | Insufficient evidence to determine effectiveness† | Prohibit purchase of firearms by persons with specified characteristics thought to indicate high risk of illegal or other harmful use. Restriction characteristics include criminal histories (e.g., felony conviction or indictment, domestic violence restraining order, fugitive of justice, conviction on drug charges), personal histories (e.g., adjudicated to be "mentally defective," illegal immigrant, dishonorable military discharge), or other characteristics (e.g., juvenile). | Evidence insufficient because of small numbers of studies, inconsistent evidence of effectiveness, and limitations in design and execution of available studies. Record systems for assessing restriction histories of firearms purchase applicants are lacking, especially for restriction histories other than felony. |
| Waiting periods for firearm acquisition (7)¶ | Insufficient evidence to determine effectiveness† | Require that the acquisition of a firearm be delayed for a specified period after application for firearm acquisition is filed. Requirement is usually imposed to allow time for a background check on prospective purchaser or to provide "cooling-off" period for persons at risk of committing suicide or an impulsive crime against others. | Evidence insufficient because of small numbers of studies, inconsistent evidence of effectiveness, and limitations in design and execution of available studies. Apparent reduction in rates of firearms suicide among persons aged >55 years, associated with the interim Brady Law, is attributable to waiting period in the interim law. |
| **Firearm registration and licensing of firearm owners** | | | |
| Registration of firearms (2)** | Insufficient evidence to determine effectiveness† | Record of owner of specified firearms must be created and retained. | Evidence insufficient because of small numbers of studies and limitations in the design and execution of available studies. |
| Licensing of firearm owners (5)†† | Insufficient evidence to determine effectiveness† | License or other form of authorization or certification is required for purchase or possession of a firearm. | Evidence insufficient because of small numbers of studies, inconsistent evidence of effectiveness, and limitations in design and execution of available studies. |
| "Shall issue" concealed weapon carry laws (9)§§ | Insufficient evidence to determine effectiveness† | Require issuing of concealed weapon carry permit to all applicants not disqualified by specified criteria. Usually implemented in place of "may issue" laws, in which issuing of a concealed weapon carry permit is discretionary (based on criteria such as perceived need or moral character of applicant). | Evidence insufficient because of critical flaws in quality of data used in the majority of studies and limitations in execution of available studies. |
| Child access prevention laws (3)¶¶ | Insufficient evidence to determine effectiveness† | Designed to limit child access to, and use of, firearms kept in homes. Require owners to store firearms locked or unloaded and make the firearm owner liable when children use or threaten to use a household firearm to harm themselves or another. | Evidence insufficient because of small numbers of studies, inconsistent evidence of effectiveness, and limitations in execution of available studies. Inappropriate outcome measures used in studies (e.g., rates of juvenile victimization rather than perpetration of firearm violence by juveniles). |
| Zero tolerance laws for firearms in schools (1)*** | Insufficient evidence to determine effectiveness† | Require that participating schools expel for at least 1 year students found carrying a gun in school. Local modifications possible for individual students. | Evidence insufficient because of absence of relevant studies; no studies evaluated violent outcomes of zero-tolerance laws. Possible violent and other harmful consequences of expulsion. |
| **Combinations of laws** | | | |
| Comprehensive national law studies (2)††† | Insufficient evidence to determine effectiveness† | Comprehensive firearm laws that include more than one kind of legislation. | Evidence insufficient because of small numbers of independent studies, inconsistent evidence of effectiveness, and limitations in study execution. |
| International comparative studies (3)§§§ | Insufficient evidence to determine effectiveness† | Cross-national comparisons examining differences in an existing sum of national firearm laws. | Evidence insufficient because of small numbers of studies, inconsistent evidence of effectiveness, and limitations in the execution of available studies. Difficult to control confounding. |
| Studies that use the index of overall law restrictiveness (6)¶¶¶ | Insufficient evidence to determine effectiveness† | Use a derived measure of overall restrictiveness of existing firearm laws a basis for comparison. | Evidence insufficient because of inconsistent evidence of effectiveness and limitations in execution of available studies. As conducted, index studies would not indicate which laws are effective (or ineffective) in which combinations. |

violence

* Sources: Britt CL, Bordua DJ, Kleck G. A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment. Law Soc Rev 1996;30:361–80. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Loftin C, McDowall D, Wiersma B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med 1991;325:1615–20. Roth JA, Koper CS. Impacts of the 1994 Assault Weapons Ban: 1994–1996. Washington, DC: US Department of Justice, 1999. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on crime guns. Inj Prev 1999;5:259–63. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. Am J Public Health 1997;87:297–8.

† A determination that evidence is insufficient should not be interpreted as evidence of ineffectiveness. A determination of insufficient evidence assists in identifying 1) areas of uncertainty regarding effectiveness of an intervention, and 2) specific continuing research needs. In contrast, evidence of ineffectiveness or evidence of harm outweighing benefit leads to a recommendation against use of the intervention.

§ Sources: Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA 2000;284:585–91. Wintemute GJ, Wright MA, Drake C, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns. JAMA 2001;285:1019–26. Wright MA, Wintemute GJ, Rivara FP. Effectiveness of denial of handgun purchase to persons believed to be at high risk for firearm violence. Am J Public Health 1999;89:88–90.

¶ Sources: Cantor CH, Slater PJ. The impact of firearm control legislation on suicide in Queensland: preliminary findings. Med J Aust 1995;162:583–5. DeZee MR. Gun control legislation: impact and ideology. Law Policy Q 1983;5:367–79. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Lott JR, Whitley JE. Safe-storage gun laws: accidental deaths, suicides, and crime. J Law Econ 2001;44:659–90. Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA 2000;284:585– 91. Magaddino JP, Medoff MH. An empirical analysis of federal and state firearm control laws. In: Kates DB, ed. Firearms and violence. Cambridge, MA: Ballinger Publishing Company, 1984:225–58. Murray D. Handguns, gun control laws and firearm violence. Soc Probl 1975;23:81–92.

** Sources: Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. Inj Prev 2001;7:184–9.

†† Sources: DeZee MR. Gun control legislation: impact and ideology. Law Policy Q 1983;5:367–79. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Magaddino JP, Medoff MH. An empirical analysis of federal and state firearm control laws. In: Kates DB, ed. Firearms and violence. Cambridge,MA: Ballinger Publishing Company, 1984:225–58. Murray D. Handguns, gun control laws and firearm violence. Soc Probl 1975;23:81–92. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. Inj Prev 2001;7:184–9.

§§ Sources: Black DA, Nagin D. Do right-to-carry laws deter violent crime? J Leg Stud 1998;27:209–19. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Lott JR. More guns, less crime: understanding crime and gun-control laws, 2nd edition. Chicago: University of Chicago Press, 2000. Ludwig J. Concealed-gun-carrying laws and violent crime: evidence from state panel data. Int Rev Law Econ 1998;18:239–54. McDowall D, Loftin C, Wiersma B. Easing concealed firearms laws: effects on homicide in three states. J Criminal Law Criminol 1995;86:193–206. Moody CE. Testing for the effects of concealed weapons laws: specification errors and robustness. J Law Econ 2001;44:799–813. Mustard DB. The impact of gun laws on police deaths. J Law Econ 2001;44:635–58. Olson DE, Maltz MD. Right-to-carry concealed weapon laws and homicide in large U.S. counties: the effect on weapon types, victim characteristics, and victim–offender relationship. J Law Econ 2001;44:747–70. Plassmann F, Tideman TN. Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. J Law Econ 2001;44:771–98.

¶¶ Sources: Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide. Am J Public Health 1997;87(6):974-8. Lott JR, Whitley JE. Safe-storage gun laws: accidental deaths, suicides, and crime. J Law Econ 2001;44:659–90. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. Pediatrics 2000;106:1466–9.

*** Source: CDC. Violence-related attitudes and behaviors of high school students—New York City, 1992. MMWR 1993;42:773–7.

††† Sources: Magaddino JP, Medoff MH. An empirical analysis of federal and state firearm control laws. In: Kates DB, ed. Firearms and violence. Cambridge,MA: Ballinger Publishing Company; 1984:225–258. Department of Justice Canada. A statistical analysis of the impacts of the 1977 firearms control legislation. Ottawa, Ontario: Department of Justice Canada, Programme Evaluation Section, 1996.

§§§ Sources: Centerwall BS. Homicide and the prevalence of handguns: Canada and the United States, 1976 to 1980. Am J Epidemiol 1991;134:1245–60. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988;319:1256–62. Sloan JH, Rivara FP, Reay DT, Ferris JAJ, Path MRC, Kellermann AL. Firearm regulations and rates of suicide: a comparison of two metropolitan areas. N Engl J Med 1990;322:369–73.

¶¶¶ Sources: Boor M, Blair JH. Suicide rates, handgun control laws, and sociodemographic variables. Psychol Rep 1990;66:923–30. Geisel M, Roll R, Wettick R. The effectiveness of state and local regulation of handguns. Duke Law J 1969;43:647–73. DeZee MR. Gun control legislation: impact and ideology. Law Policy Q 1983;5:367–79. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9:249–87. Magaddino JP, Medoff MH. An empirical analysis of federal and state firearm control laws. In: Kates DB, ed. Firearms and violence. Cambridge, MA: Ballinger Publishing Company, 1984:225–258. Medoff MH, Magaddino JP. Suicides and firearm control laws. Eval Rev 1983;7:357–72.

Return to top.

**Box**

BOX. Selected national health objectives that might be affected by firearms laws

---

### Injury Prevention

- Reduce firearm-related deaths from 11.3 to 4.1 per 100,000 population[†] (Objective 15-3).
- Reduce the proportion of persons living in homes with firearms that are loaded and unlocked from 19% to 16%[†] (Objective 15-4).
- Reduce nonfatal firearm-related injuries from 24.0 (in 1997) to 8.6 per 100,000 population (Objective 15-5).

### Unintentional Injury Prevention

- Reduce deaths caused by unintentional injuries from 35.0 to 17.5 per 100,000 population[†] (Objective 15-13).
- (Developmental) Reduce nonfatal unintentional injuries (Objective 15-14).

### Violence and Abuse Prevention

- Reduce homicides from 6.5 to 3.0 per 100,000 population[†] (Objective 15-32).
- Reduce the rate of physical assault by current or former intimate partners from 4.4 (in 1998) to 3.3 per 1,000 persons aged $\geq$12 years (Objective 15-34).
- Reduce the annual rate of rape or attempted rape from 0.8 (in 1998) to 0.7 per 1,000 persons aged $\geq$12 years (Objective 15-35).
- Reduce sexual assault other than rape from 0.6 (in 1998) to 0.4 per 1,000 persons aged $\geq$12 years (Objective 15-36).
- Reduce physical assaults from 31.1 (in 1998) to 13.6 per 1,000 persons aged $\geq$12 years (Objective 15-37).
- Reduce weapon carrying by adolescents on school property from 6.9% (in 1999) to 4.9% (students in grades 9 through 12, carrying during the past 30 days) (Objective 15-39).

---

\* **Source:** US Department of Health and Human Services. Healthy people 2010. 2nd ed. With Understanding and Improving Health and Objectives for Improving Health (2 vols). Washington, DC: US Department of Health and Human Services, 2000.
† Baseline: 1998 data, age adjusted to the year 2000 standard population.

[Return to top.](#)

---

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

---

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

**Disclaimer**   All *MMWR* HTML versions of articles are electronic conversions from ASCII text into HTML. This conversion may have resulted in character translation or format errors in the HTML version. Users should not rely on this HTML document, but are referred to the electronic PDF version and/or the original *MMWR* paper copy for the official text, figures, and tables. An original paper copy of this issue can be obtained from the Superintendent of Documents, U.S. Government Printing Office (GPO), Washington, DC 20402-9371; telephone: (202) 512-1800. Contact GPO for current prices.

**Questions or messages regarding errors in formatting should be addressed to [mmwrq@cdc.gov](mailto:mmwrq@cdc.gov).

Page converted: 9/29/2003

Centers for Disease Control and Prevention
1600 Clifton Rd, MailStop E-90, Atlanta, GA 30333,
U.S.A



This page last reviewed 9/29/2003

# EXHIBIT 30



SENIOR PARTNER
C. D. MICHEL*

MANAGING PARTNER
JOSHUA ROBERT DALE

SPECIAL COUNSEL
W. LEE SMITH

ASSOCIATES
ANNA M. BARVIR
SEAN A. BRADY
TIFFANY D. CHEUVRONT
MATTHEW D. CUBEIRO
ALEXANDER A. FRANK
LOS ANGELES, CA

*  ALSO ADMITTED IN TEXAS AND
   THE DISTRICT OF COLUMBIA

OF COUNSEL
JOSEPH DI MONDA
SCOTT M. FRANKLIN
CLINT B. MONFORT
MICHAEL W. PRICE
TAMARA M. RIDER
LOS ANGELES, CA

WRITER'S DIRECT CONTACT:
562-216-4478
POKITA@MICHELLAWYERS.COM

May 21, 2019

**VIA U.S. MAIL AND FAX**

Department of Public Works
Bureau of Contract Administration
Office of Contract Compliance
1149 S. Broadway, Suite 300
Los Angeles, CA 90015
213-847-2625
213-847-2777 (fax)

Re:    **PRAR # 2069163 – Request for Affidavits Disclosing Contracts and
       Sponsorship of the National Rifle Association**

To Records Custodian or Records Coordinator:

This letter constitutes a request under the Public Records Act, California Government Code
Section 6250, et seq (the "Act"), and seeks the information listed below, regardless of the medium
upon which it is kept.

This request is directed *individually* (1) to each person/entity identified in the addressee section
above, and (2) to the Public Records Act Clerk or designee for each entity or person identified in the
addressee section above. One or several of the above may respond on behalf of any number of the
others; however, each person/entity responding on behalf of another must so state in the response. To
the extent that an aggregate responding person/entity fails to identify that such person/entity is
responding on behalf of another, we do not waive the right to require a response from each such
person/entity from whom we have not received a specific response.

All references to standards for compliance are pursuant to California Government Code Section
6250, et seq., as amended by California Assembly Bill 2799, effective January 1, 2001, and further
informed by the heightened right to information as provided by the California Constitution, article 1,
section 3, as amended by Proposition 59.

**INFORMATION REQUESTED**

Public Records Act Request # 2069163
May 21, 2019
Page 2 of 3

      This request seeks the information listed below, whether in the form of a writing,[1] computer file, photograph, audio or video recording, or however kept. Please note that public records requests also apply to social media accounts of public officials and public employees where "an employee uses a personal account to communicate about the conduct of public business, the writings may be subject to disclosure under the California Public Records Act." (*City of San Jose v. Sup. Ct.* (2017) 2 Cal.5th 608, 614-15.)

1. Any and all affidavits[2] filed by contactors[3] or prospective contractors[4] disclosing association with the National Rifle Association ("NRA") from April 1, 2019 to May 22, 2019.

2. The total number of contractors and prospective contractors that disclosed NRA affiliations per the Disclosure of Contracts and Sponsorship of the NRA Ordinance from April 1, 2019 to May 22, 2019.

3. The number of contractors and prospective contractors that that disclosed NRA affiliations per the Disclosure of Contracts and Sponsorship of the NRA Ordinance and *were* granted contracts.

4. The number of contractors and prospective contractors that that disclosed NRA affiliations per the Disclosure of Contracts and Sponsorship of the NRA Ordinance and *were not* granted contracts.

## TIME TO RESPOND & COST REIMBURSEMENT

      Please review this request in its entirety and include the above reference number in all future correspondence regarding this request. If the items listed above are under the control of another

---

[1] "Writing," whether singular or plural, includes those items listed in the paragraph above, as well as those items described in the definition provided by Evidence Code section 250, which provides as follows: " 'Writing' means handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored."

[2] For purposes of this request, an "affidavit" is the form that a contractor must sign under penalty of perjury requiring disclosure of any contract between a person, firm, corporation, partnership or combination thereof and the NRA or any agreement between a person, firm, corporation, partnership or combination thereof and the NRA to provide a discount to the NRA or NRA member of the customary costs, fees, or service charges for goods or services provided by the person, firm, corporation, partnership or combination thereof.

[3] For the purposes of this request, a "contractor" is any person, firm, corporation, partnership or combination thereof that has a contract with the City of Los Angeles.

[4] For the purposes of this request, a "prospective contractor" is any person, firm, corporation, partnership or combination thereof that, in seeking to form a contract with the City of Los Angeles, signed an affidavit disclosing any NRA affiliations that it has.

Public Records Act Request # 2069163
May 21, 2019
Page 3 of 3

department or agency, please forward this letter accordingly. The Act directs that you provide a response within ten (10) days of your receipt of this letter.

Pursuant to Government Code section 6253(b), we ask that you make the records promptly available by copying and forwarding those records to us. We do not object to the production of documents that have private phone numbers or email addresses redacted. We are willing to pay reasonable costs to reimburse you for direct costs of duplication or statutory fees. If you estimate that the direct copying costs will exceed fifty dollars ($50.00), please do not begin the process of copying; rather, notify us first of the cost estimate so that we may determine how best to proceed.

Thank you for your cooperation. Please do not hesitate to call if you have questions regarding the foregoing.

Sincerely,
**Michel & Associates, P.C.**

Philip Okita

**From:** Nextiva vFax
**Sent:** Tuesday, May 21, 2019 5:15 PM
**To:** efax
**Subject:** Message Sent: 496093267 | 5/21/2019 5:10:56 PM PDT
**Attachments:** 496093267.pdf

**Delivery Information:**

| | |
|---|---|
| Message #: | 496093267 |
| Status: | Success |
| Sender Name: | Michel & Associates PC |
| Sender Company: | Michel and Associates |
| Sender Phone: | 5622164444 |
| Remote CSID: | 2138472777 |
| Total Pages: | 4 |
| Start Time: | 5/21/2019 5:10:56 PM PDT |
| End Time: | 5/21/2019 5:14:20 PM PDT |
| Duration: | 0.188 sec |
| Delivery Count: | 1 |

**Recipient List:**
Office of Contract Compliance - 12138472777

Click here to view this message online

---

Delivered by **Nextiva vFax**…                    "When Every Fax is Mission Critical"

1

# Fax Transmission

**To:**   Office of Contract Compliance          **From:**   Michel & Associates PC

**Fax:**  12138472777                             **Date:**   5/21/2019 5:10:56 PM PDT

**RE:**   Public Records Act Request # 2069163   **Pages:**  4

---

**Comments:**

# EXHIBIT 31

## DISCLOSURE OF CONTRACTS AND SPONSORSHIP OF THE NRA ORDINANCE

| Company | BAVN Co. ID # | Date Submitted | Description |
|---|---|---|---|
| ▪▪▪▪▪ | 100482 | 4/4/2019 | ▪▪▪▪▪ (Company id ▪▪▪▪) Manufactures .177 caliber CO2 powered air guns and sponsorship with youth air gun events for the NRA under license agreement. |
| ▪▪▪▪▪ | 73437 | 5/15/2019 | ▪▪▪▪ and its affiliates provide a broad array of telecommunications services to customers worldwide. After a search of our business records we have confirmed that the NRA purchases generally available commercial telecommunications services from ▪▪▪▪. ▪▪▪▪ does not provide any discounts to the NRA or to NRA members off the customary costs, fees or service charges for goods or services.  Pricing is based on volume and term commitments. |
| ▪▪▪▪▪ | 31453 | 5/21/2019 | The NRA was a client of ▪▪▪▪▪ from 2014 to 2016. ▪▪▪▪ handled two legal matters for the NRA, and the lead partner on both of those matters was a lawyer who is no longer with the firm. When he left in 2016, their relationship with the NRA ended. |

**DO/DBWCO COMPLIANCE**

## CITY OF LOS ANGELES - DISCLOSURE ORDINANCES

This Affidavit must only be submitted once on LABAVN (www.labavn.org), but contractors are responsible for updating their Affidavit if changes occur to any information contained therein.

Questions regarding this Affidavit may be directed to the Department of Public Works, Bureau of Contract Administration, Office of Contract Compliance. Website: http://bca.lacity.org/index.cfm;Phone: (213) 847-2625; E-mail: bca.eeoe@lacity.org.

### AFFIDAVIT DISCLOSING SLAVERY ERA PARTICIPATION, INVESTMENTS OR PROFITS

1. I, ███████ _____ am authorized to bind contractually the Company identified below.

2. Information about the Company entering into a Contract with the City is as follows:

   ███████████                                    ████████
   BAVN Company Id                                 EIN/TIN

   ██████████
   Company Name

   ███ ██████████████                 ████████████   ██       ██████
   Street Address                      City            State    Zip

   ████████                            ██████████████
   Phone                               Email

3. The company came into existence in    2006        (year).

4. The Company has searched its records and those of any Predecessor Companies for information relating to Participation or Investments in, or Profits derived from Slavery or Slaveholder Insurance Policies. Based on that research, the Company represents that (mark only the option(s) that apply):

   ☑ The Company found no records that the Company or any of its Predecessor Companies had any Participation or Investments in, or derived Profits from, Slavery or Slaveholder Insurance Policies during the Slavery Era.

   ☐ The Company found records that the Company or its Predecessor Companies Participated or Invested in, or derived Profits from Slavery during the Slavery Era. A description of the nature of that Participation, Investment, or Profit is required and should be sent to bca.eeoe@lacity.org.

   ☐ The Company found records that the Company or its Predecessor Companies bought, sold, or derived Profits from Slaveholder Insurance Policies during the Slavery Era. A list of names of any Enslaved Persons or Slaveholders under the Policies is required and should be sent to bca.eeoe@lacity.org.

5. The Person/Company has searched its records for information relating and based on that research, the Person/Company represents that (mark only the option(s) that apply):

   ☑ The Person/Company found no records that the Company has participated in contracts, bids, or proposals to provide goods or services for the design, construction, operation, or maintenance of a federally funded wall, fence or other barrier, including prototypes of a wall, fence or other barrier along the border between the United States and Mexico on or after March 17, 2017.

   ☐ The Person/Company found records that the Company has participated in contracts, bids, or proposals to provide goods or services for the design, construction, operation, or maintenance of a federally funded wall, fence or other barrier, including prototypes of a wall, fence or other barrier along the border between the United States and Mexico on or after March 17, 2017. A description of the nature of that Participation is required and should be sent to bca.eeoe@lacity.org.

6. The Person/Company has searched its records for information relating and based on that research, the Person/Company represents that (mark only the option(s) that apply):

   ☐ The Person found no records that the Company and its Subsidiaries, if any, have participated in contracts or sponsorships with the National Rifle Association.

   ☑ The Person found records that the Company and its Subsidiaries, if any, have participated in contracts or sponsorships with the National Rifle Association. A description of the nature of that Participation is required and should be sent to bca.eeoe@lacity.org.

**TERMS OF ACCEPTANCE AND SIGNATURE:**

I, ████████, the requestor for this "DO Affidavit", warrant the truthfulness of the information provided in the document.

**Electronic Signature:** *

████████

_Signature_                                              03 April, 2019
                                                         _Date_

☑ I understand that checking this box constitutes a legal signature confirming that I acknowledge and agree to the above
Terms of Acceptance.

**Execution of document by E-signature.** By clicking on the check box it indicates an electronic signature. This is considered the
legal equivalent of a manual or "wet" signature. Once signed electronically, this document is considered original and legally binding.

## DEFINITIONS

**Affidavit** means the form developed by the DAA and may be updated from time to time. The Affidavit need not be notarized but must be signed under penalty of perjury.

**Company** means any person, firm, corporation, partnership or combination of these.

**Contract** means any agreement, franchise, lease or concession including an agreement for any occasional professional or technical personal services, the performance of any work or service, the provision of any materials or supplies or rendering of any service to the City of Los Angeles or the public, which is let, awarded or entered into with or on behalf of the City of Los Angeles or any Awarding Authority of the City.

**Enslaved Person** means any person who was wholly subject to the will of another and whose person and services were wholly under the control of another and who was in a state of enforced compulsory service to another during the Slavery Era.

**Investment** means to make use of an Enslaved Person for future benefits or advantages.

**Participation** means having been a Slaveholder during the Slavery Era.

**Predecessor Company** means an entity whose ownership, title and interest, including all rights, benefits, duties and liabilities were acquired in an uninterrupted chain of succession by the Company.

**Profits** means any economic advantage or financial benefit derived from the use of Enslaved Persons.

**Slavery** means the practice of owning Enslaved Persons.

**Slavery Era** means that period of time in the United States of America prior to 1865.

**Slaveholder** means holders of Enslaved Persons, owners of business enterprises using Enslaved Persons, owners of vessels carrying Enslaved Persons or other means of transporting Enslaved Persons, merchants or financiers dealing in the purchase, sale or financing of the business of Enslaved Persons.

**Slaveholder Insurance Policies** means policies issued to or for the benefit of Slaveholders to insure them against the death of, or injury to, Enslaved Persons.

BAVN-DO (02/2019)

DO/DBWCO COMPLIANCE

## CITY OF LOS ANGELES - DISCLOSURE ORDINANCES

This Affidavit must only be submitted once on LABAVN (www.labavn.org), but contractors are responsible for updating their Affidavit if changes occur to any information contained therein.

Questions regarding this Affidavit may be directed to the Department of Public Works, Bureau of Contract Administration, Office of Contract Compliance. Website: http://bca.lacity.org/index.cfm;Phone: (213) 847-2625; E-mail: bca.eeoc@lacity.org.

### AFFIDAVIT DISCLOSING SLAVERY ERA PARTICIPATION, INVESTMENTS OR PROFITS

1. I, ▮▮▮▮▮▮▮▮▮ _____ am authorized to bind contractually the Company identified below.

2. Information about the Company entering into a Contract with the City is as follows:

   ▮▮▮▮▮▮                                   ▮▮▮▮▮▮
   BAVN Company Id                           EIN/TIN

   ▮▮▮▮▮
   Company Name

   ▮▮▮▮▮▮▮▮▮               ▮▮▮▮▮▮▮     ▮▮▮     ▮▮▮
   Street Address              City            State    Zip

   ▮▮▮▮▮                   ▮▮▮▮▮▮▮
   Phone                       Email

3. The company came into existence in   2000        (year).

4. The Company has searched its records and those of any Predecessor Companies for information relating to Participation or Investments in, or Profits derived from Slavery or Slaveholder Insurance Policies. Based on that research, the Company represents that: (mark only the option(s) that apply):

   ☑ The Company found no records that the Company or any of its Predecessor Companies had any Participation or Investments in, or derived Profits from, Slavery or Slaveholder Insurance Policies during the Slavery Era.

   ☐ The Company found records that the Company or its Predecessor Companies Participated or Invested in, or derived Profits from Slavery during the Slavery Era. A description of the nature of that Participation, Investment, or Profit is required and should be sent to bca.eeoc@lacity.org.

   ☐ The Company found records that the Company or its Predecessor Companies bought, sold, or derived Profits from Slaveholder Insurance Policies during the Slavery Era. A list of names of any Enslaved Persons or Slaveholders under the Policies is required and should be sent to bca.eeoc@lacity.org.

5. The Person/Company has searched its records for information relating and based on that research, the Person/Company represents that (mark only the option(s) that apply):

   ☑ The Person/Company found no records that the Company has participated in contracts, bids, or proposals to provide goods or services for the design, construction, operation, or maintenance of a federally funded wall, fence or other barrier, including prototypes of a wall, fence or other barrier along the border between the United States and Mexico on or after March 17, 2017.

   ☐ The Person/Company found records that the Company has participated in contracts, bids, or proposals to provide goods or services for the design, construction, operation, or maintenance of a federally funded wall, fence or other barrier, including prototypes of a wall, fence or other barrier along the border between the United States and Mexico on or after March 17, 2017. A description of the nature of that Participation is required and should be sent to bca.eeoc@lacity.org.

6. The Person/Company has searched its records for information relating and based on that research, the Person/Company represents that: (mark only the option(s) that apply):

   ☐ The Person found no records that the Company and its Subsidiaries, if any, have participated in contracts or sponsorships with the National Rifle Association.

   ☑ The Person found records that the Company and its Subsidiaries, if any, have participated in contracts or sponsorships with the National Rifle Association. A description of the nature of that Participation is required and should be sent to bca.eeoc@lacity.org.

**TERMS OF ACCEPTANCE AND SIGNATURE:**

I, ██████████, the requestor for this "DO Affidavit", warrant the truthfulness of the information provided in the document.

**Electronic Signature:**\*

████████████                                      14 May, 2019
*Signature*                                           *Date*

☑ I understand that checking this box constitutes a legal signature confirming that I acknowledge and agree to the above
Terms of Acceptance.

**Execution of document by E-signature.** By clicking on the check box it indicates an electronic signature. This is considered the
legal equivalent of a manual or "wet" signature. Once signed electronically, this document is considered original and legally binding.

## DEFINITIONS

**Affidavit** means the form developed by the DAA and may be updated from time to time. The Affidavit need not be notarized but must be signed under penalty of perjury.

**Company** means any person, firm, corporation, partnership or combination of these.

**Contract** means any agreement, franchise, lease or concession including an agreement for any occasional professional or technical personal services, the performance of any work or service, the provision of any materials or supplies or rendering of any service to the City of Los Angeles or the public, which is let, awarded or entered into with or on behalf of the City of Los Angeles or any Awarding Authority of the City.

**Enslaved Person** means any person who was wholly subject to the will of another and whose person and services were wholly under the control of another and who was in a state of enforced compulsory service to another during the Slavery Era.

**Investment** means to make use of an Enslaved Person for future benefits or advantages.

**Participation** means having been a Slaveholder during the Slavery Era.

**Predecessor Company** means an entity whose ownership, title and interest, including all rights, benefits, duties and liabilities were acquired in an uninterrupted chain of succession by the Company.

**Profits** means any economic advantage or financial benefit derived from the use of Enslaved Persons.

**Slavery** means the practice of owning Enslaved Persons.

**Slavery Era** means that period of time in the United States of America prior to 1865.

**Slaveholder** means holders of Enslaved Persons, owners of business enterprises using Enslaved Persons, owners of vessels carrying Enslaved Persons or other means of transporting Enslaved Persons, merchants or financiers dealing in the purchase, sale or financing of the business of Enslaved Persons.

**Slaveholder Insurance Policies** means policies issued to or for the benefit of Slaveholders to insure them against the death of, or injury to, Enslaved Persons.

BAVN-DO (02/2019)

**DO/DBWCO COMPLIANCE**

## CITY OF LOS ANGELES - DISCLOSURE ORDINANCES

This Affidavit must only be submitted once on LABAVN (www.labavn.org), but contractors are responsible for updating their Affidavit if changes occur to any information contained therein.

Questions regarding this Affidavit may be directed to the Department of Public Works, Bureau of Contract Administration, Office of Contract Compliance. Website: http://bca.lacity.org/index.cfm;Phone: (213) 847-2625; E-mail: bca.eeoe@lacity.org.

### AFFIDAVIT DISCLOSING SLAVERY ERA PARTICIPATION, INVESTMENTS OR PROFITS

1. I, ███████████              am authorized to bind contractually the Company identified below.

2. Information about the Company entering into a Contract with the City is as follows:

   ███████████                                    █████████
   BAVN Company Id                                 EIN/TIN

   █████████████████████
   Company Name

   █████████████████                  ████████          ████    ██████
   Street Address                     City              State   Zip

   ████████                           ██████████████
   Phone                              Email

3. The company came into existence in   1979   (year).

4. The Company has searched its records and those of any Predecessor Companies for information relating to Participation or Investments in, or Profits derived from Slavery or Slaveholder Insurance Policies. Based on that research, the Company represents that: (mark only the option(s) that apply):

   ☑ The Company found no records that the Company or any of its Predecessor Companies had any Participation or Investments in, or derived Profits from, Slavery or Slaveholder Insurance Policies during the Slavery Era.

   ☐ The Company found records that the Company or its Predecessor Companies Participated or Invested in, or derived Profits from Slavery during the Slavery Era. A description of the nature of that Participation, Investment, or Profit is required and should be sent to bca.eeoe@lacity.org.

   ☐ The Company found records that the Company or its Predecessor Companies bought, sold, or derived Profits from Slaveholder Insurance Policies during the Slavery Era. A list of names of any Enslaved Persons or Slaveholders under the Policies is required and should be sent to bca.eeoe@lacity.org.

5. The Person/Company has searched its records for information relating and based on that research, the Person/Company represents that (mark only the option(s) that apply):

   ☑ The Person/Company found no records that the Company has participated in contracts, bids, or proposals to provide goods or services for the design, construction, operation, or maintenance of a federally funded wall, fence or other barrier, including prototypes of a wall, fence or other barrier along the border between the United States and Mexico on or after March 17, 2017.

   ☐ The Person/Company found records that the Company has participated in contracts, bids, or proposals to provide goods or services for the design, construction, operation, or maintenance of a federally funded wall, fence or other barrier, including prototypes of a wall, fence or other barrier along the border between the United States and Mexico on or after March 17, 2017. A description of the nature of that Participation is required and should be sent to bca.eeoe@lacity.org.

6. The Person/Company has searched its records for information relating and based on that research, the Person/Company represents that (mark only the option(s) that apply):

   ☐ The Person found no records that the Company and its Subsidiaries, if any, have participated in contracts or sponsorships with the National Rifle Association.

   ☑ The Person found records that the Company and its Subsidiaries, if any, have participated in contracts or sponsorships with the National Rifle Association. A description of the nature of that Participation is required and should be sent to bca.eeoe@lacity.org.

**TERMS OF ACCEPTANCE AND SIGNATURE:**

I, ████████ the requestor for this "DO Affidavit", warrant the truthfulness of the information provided in the document.

**Electronic Signature:***

████████                                              20 May, 2019
_____                       _____
Signature                                             Date

☑ I understand that checking this box constitutes a legal signature confirming that I acknowledge and agree to the above
Terms of Acceptance.

**Execution of document by E-signature.** By clicking on the check box it indicates an electronic signature. This is considered the
legal equivalent of a manual or "wet" signature. Once signed electronically, this document is considered original and legally binding.

## DEFINITIONS

**Affidavit** means the form developed by the DAA and may be updated from time to time. The Affidavit need not be notarized but must be signed under penalty of perjury.

**Company** means any person, firm, corporation, partnership or combination of these.

**Contract** means any agreement, franchise, lease or concession including an agreement for any occasional professional or technical personal services, the performance of any work or service, the provision of any materials or supplies or rendering of any service to the City of Los Angeles or the public, which is let, awarded or entered into with or on behalf of the City of Los Angeles or any Awarding Authority of the City.

**Enslaved Person** means any person who was wholly subject to the will of another and whose person and services were wholly under the control of another and who was in a state of enforced compulsory service to another during the Slavery Era.

**Investment** means to make use of an Enslaved Person for future benefits or advantages.

**Participation** means having been a Slaveholder during the Slavery Era.

**Predecessor Company** means an entity whose ownership, title and interest, including all rights, benefits, duties and liabilities were acquired in an uninterrupted chain of succession by the Company.

**Profits** means any economic advantage or financial benefit derived from the use of Enslaved Persons.

**Slavery** means the practice of owning Enslaved Persons.

**Slavery Era** means that period of time in the United States of America prior to 1865.

**Slaveholder** means holders of Enslaved Persons, owners of business enterprises using Enslaved Persons, owners of vessels carrying Enslaved Persons or other means of transporting Enslaved Persons, merchants or financiers dealing in the purchase, sale or financing of the business of Enslaved Persons.

**Slaveholder Insurance Policies** means policies issued to or for the benefit of Slaveholders to insure them against the death of, or injury to, Enslaved Persons.

BAVN-DO (02/2019)

# EXHIBIT 32

# NRA stance lands airline in quagmire

## Delta finds political middle ground elusive after its decision to end discounts.

Los Angeles Times · 28 Feb 2018 · By Matt Pearce matt.pearce@latimes.com

It's getting harder and harder to find neutral territory in America's raging gun control debate. Just ask FedEx and Delta Air Lines, companies that — you'd think — don't have anything to do with firearms.

Over the last two weeks, both have been under pressure to take a position on guns by two of the most powerful forces in U.S. politics right now: the National Rifle Assn. and the students of Marjory Stoneman Douglas High School.

The story starts — as many gun control stories now do — with the students.

After a gunman killed 17 people on Feb. 14 at their Parkland, Fla., school, the students turned their youthful energies toward reinvigorating the nation's gun control movement, which has long been powered by outraged survivors and victims' family members.

The students have rallied widespread support among left-leaning Americans, and they have used their social media skills to unleash a public backlash that seeks to marginalize and isolate the NRA, which says it has more than 5 million members.

Feeling a political wind growing at the students' backs — and adopting tactics from recent social media campaigns — gun control advocates began pressuring prominent corporations to drop their discount deals for NRA members.

In a sign of how much the NRA has been put on the defensive, many of those companies cut ties.

FedEx tried to find a middle ground. The publicly traded shipping company issued a statement saying it supported an assault weapons ban and background checks for gun purchases, adding, "FedEx views assault rifles and large capacity magazines as an inherent danger to schools, workplaces and communities when such weapons are misused."

But the company also said it would not drop NRA members' discounted shipping rates, implying that the company might violate federal law by doing so.

Despite ostensibly dealing a blow to the NRA in calling for gun control, the company's decision to defend its NRA discount drew blowback from gun control supporters. They have threatened a boycott against FedEx and other companies that have not dropped their relationships with the NRA.

On Saturday, Delta took a different path, notifying the NRA that the airline was dropping its contract for discounted fares for members traveling to the group's 2018 annual meeting in Dallas.

The company was not throwing in its lot with the student activists, exactly. Facing growing public pressure, it was trying to extricate itself from a deteriorating situation as rapidly as possible.

"Delta's decision reflects the airline's neutral status in the current national debate over gun control amid recent school shootings," the company said in a statement. "Out of respect for our customers and

employees on both sides, Delta has taken this action to refrain from entering this debate and focus on its business."

To make the point clear, Delta officials added: "Delta continues to support the 2nd Amendment." (That's not your average corporate declaration. Imagine if Holiday Inn issued a statement affirming it supports the 6th Amendment right to a speedy trial; if you have to say it, you're probably in trouble.)

To gun control supporters, it was good enough. "To all companies who severed ties with the NRA, those personally affected by their influence on legislation thank you," tweeted Emma Gonzalez, one of the most prominent Stoneman Douglas student activists.

But gun rights supporters were outraged, seeing the students' campaign as an unjust attack on lawful gun owners.

"So @Delta, you REALLY want 5 million #NRA members like me, who have NEVER committed a mass shooting, to f ly on your competition? Done," tweeted one member, Jessie Jane Duff, earning more than 4,000 retweets. "Who ever thought this was a great PR campaign idea should be fired."

This has been a common response for conservatives on the losing side of pressure campaigns in the past, but they have sometimes lacked the muscle that liberal activists have mustered to influence corporate boycotts.

Except Delta has a weak spot: tax breaks.

Headquartered in Atlanta, Delta has been trying to persuade Georgia's Republican-controlled Legislature to pass a tax break on sales tax for jet fuel worth tens of millions of dollars.

So when Delta ended its discount for NRA members, that didn't sit well with Georgia Republicans.

"If Delta is so flush that they don't need NRA members' hard-earned dollars, they can certainly do without the $40 million tax break they are asking GA taxpayers for," tweeted former Republican state Sen. Rick Jeffares, who is now running for lieutenant governor. Then, on Monday, Georgia's current Republican lieutenant governor, Casey Cagle, who is also the president of the state Senate, threw down the gauntlet.

"I will kill any tax legislation that benefits @Delta unless the company changes its position and fully reinstates its relationship with @NRA," tweeted Cagle, who recently boasted of having an "A+" rating from the NRA and of having endorsements from the gun organization. "Corporations cannot attack conservatives and expect us not to fight back."

Soon after, the Atlanta Journal-Constitution reported that Georgia's Senate had in effect blocked the tax bill.

Cagle's office did not respond to a request for comment, but the NRA, tweeting the news, added a fist-bump emoji and the hashtags "#StandandFight" and "#SorryNotSorry."

Delta — now being pressured to reinstate its relationship with the NRA, or lose out on tens of millions of dollars in breaks from Georgia taxpayers — did not respond to a request for comment.

Cagle's decision to use his public office to pressure a private company over a political issue raised some concerns among legal observers.

"It is hard to evaluate at this stage, but for the state to penalize Delta for its political stance would be very problematic under the 1st Amendment," UC Berkeley law school dean Erwin Chemerinsky wrote.

But UCLA law professor Eugene Volokh thought Cagle had not over-stepped his bounds.

But of course, in this political environment, every action creates a reaction, which creates a reaction, which creates a reaction.

"@Delta, as one of your most frequent flyers, know that the NY LG admires your principled stance," tweeted Kathy Hochul, New York's Democratic lieutenant governor. "Let's continue our great relation-ship. NY is open for business & ♥'s Delta — move HQ to where you're appreciated?"

# EXHIBIT 33

ADVERTISEMENT

L.A. NOW     LOCAL

# L.A. councilman wants city to boycott companies with NRA ties

**By EMILY ALPERT REYES**
MAR 28, 2018 | 4:35 PM

TOPICS

**12 FREE WEEKS**
SALE ENDS 6/3

LOG IN

**SPECIAL SALE** | **12 WEEKS FREE**

A 102-year-old woman is being evicted so the landlords' daughter can...

Why the Minnesota Twins could sustain their astounding start

Mammoth sets rec snowfall tota Day comes

Case 2:19-cv-03212-SVW-GJS Document 19-5 Filed 05/24/19 Page 51 of 56 Page ID #:357



Los Angeles City Councilman Mitch O'Farrell attends a City Hall news conference in February. (Allen J. Schaben / Los Angeles Times)

A Los Angeles lawmaker wants the city to cut ties with companies that are linked to the National Rifle Assn., saying that its opposition to "common sense gun safety laws" is at odds with the city.

City Councilman Mitch O'Farrell introduced a proposal Wednesday asking city staffers to provide a list of all businesses and groups that have a "formal relationship" with the NRA and lay out options for boycotting them.

inRead invented by Teads

ADVERTISEMENT

"It's important that we send a message as a city with an annual budget approaching $9 billion," O'Farrell said, invoking mass shootings in Newtown, Conn.; Orlando, Fla.; Las Vegas; and Parkland, Fla.; as well as gun violence that happens regularly across the country.

"It's time to speak with one voice and call attention to the assault weapon epidemic," the councilman said.

The NRA did not immediately respond Wednesday to a request for comment. Last month, the group issued a statement denouncing "a shameful display of political and civic cowardice" from corporations that severed ties with the NRA after the shooting at Marjory Stoneman Douglas High School in Parkland.

"The law-abiding members of the NRA had nothing at all to do with the failure of that school's security preparedness, the failure of America's mental health system, the failure of the National Instant Check System or the cruel failures of both federal and local law enforcement," the group said.

The California Rifle & Pistol Assn., which is affiliated with the NRA but has its own board, is "proud to be fighting for the right to choose to own a firearm for sport or self-defense, and we refuse to be stigmatized or demonized by this campaign of shame," its president, Chuck Michel, said Wednesday.

O'Farrell said he also had asked the City Council to hold off on approving an agreement between FedEx and the Harbor Department to operate a warehouse and office space. FedEx has faced pressure from gun control advocates to stop providing discounted shipping for members of the NRA.

"We have a choice — and they have a choice," O'Farrell said, arguing that FedEx could follow the path of other companies such as Delta Air Lines that have ended such discounts or other ties. "They could join in this sensible movement to discourage the proliferation of guns."

The council postponed voting Wednesday on the FedEx agreement, which city officials say could generate up to $155,000 for the port.

A FedEx spokeswoman said the company was looking into the city decision Wednesday.

In a statement last month, FedEx said its corporate stand on gun policies was not in line with the NRA — it "opposes assault rifles being in the hands of civilians" — and stressed that the group is one of hundreds of organizations whose members get such discounts.

"FedEx has never set or changed rates for any of our millions of customers around the world in response to their politics, beliefs or positions," it said in that statement.

**4:35 p.m.:** This article was updated with a response from FedEx.
*This article was originally published at 1:35 p.m.*

---

### Essential California Newsletter

Monday - Saturday

A roundup of the stories shaping California.

ENTER YOUR EMAIL ADDRESS

## Emily Alpert Reyes

  

Emily Alpert Reyes covers City Hall for the Los Angeles Times. She previously reported on the census and demographics, tracking how our lives are changing in Los Angeles, California and the country. Before joining The Times, she worked for the pioneering nonprofit news website voiceofsandiego.org, winning national awards for her reporting on education. She has also traveled to Bolivia as a fellow with the International Reporting Project and survived the University of Chicago.

ADVERTISEMENT

BE THE FIRST TO COMMENT

## MOST READ

**MUST READS**

## A 102-year-old woman is being evicted so the landlords' daughter can move in. It's completely legal

3h

**COLUMN**

## Why the Minnesota Twins could sustain their astounding start

4h

5/24/2019
L.A. Quit climate protests city lot by GOP complaints off? PRA Yes - Los Angeles Times

Case 2:19-cv-03212-SVW-GJS   Document 19-5   Filed 05/24/19   Page 55 of 56   Page ID #:361

**L.A. NOW**

## Mammoth sets record snowfall total — as Memorial Day comes

1h

---

**L.A. NOW**

## USC was told gynecologist could be preying on Asian women, secret records show

26m

---

**L.A. NOW**

## Nipsey Hussle's plan to fight gentrification in South L.A. has made it to Congress

9:35 AM

---

### LATEST L.A. NOW

USC was told gynecologist could be preying on Asian women, secret records show

26m



---

The L.A. architecture landmark — abandoned, trashed and left to burn

1h



---

Mammoth sets record snowfall total — as Memorial Day comes

1h



---

After more guilty pleas, focus in admissions scandal shifts to parents fighting charges

2h



---

San Diego sailor admits contacting Russians, pleads guilty to espionage charges

3h



---

ADVERTISEMENT

Sign up for our newsletters

Subscribe for unlimited access

About/Contact

Archives

Classifieds

Terms

Site map

Advertising

Corrections

Privacy policy

L.A. Times careers

Find a job

Shop

Copyright © 2019, Los Angeles Times